Florencio SANDOVAL, Donald Edwards, Hazel Ellis, James M. Holmes, Herbert C. Johnson and Theodore G. Peterson, Individually and as Participants in the Keystone Master Pension Plan—National Lock Division, Plaintiffs,

v.

Harold SIMMONS, Individually and as Sole Trustee of a Trust Formed by Harold C. Simmons in 1964 for the Benefit of his Children and Grandchildren and as Director of Keystone Consolidated Industries, Inc., and as a Member of the Corporate Committee—Employees Benefit Plans of Keystone Consolidated Industries, Inc., Glenn R. Simmons, Individually and as President and Chief Executive of Keystone Consolidated Industries, Inc., Michael A. Snetzer, Individually and as Director of Keystone Consolidated Industries, Inc., John R. Sommer, Individually and as Chairman of the Board of Directors and as a Member of the Corporate Committee at Keystone Consolidated Industries, Inc., Alex M. Galbraith, Individually and as Vice-President of Finance and Treasurer and as a Member of the Corporate Committee at Keystone Consolidated Industries, Inc., Keystone Consolidated Industries, Inc., as Administrator of the Keystone Master Pension Trust and National Lock Division of Keystone Consolidated Industries, Inc., as Administrator and Sponsor of National Lock Division Hourly Employees Pension Plan, Defendants.

No. 83–1223.

United States District Court, C.D. Illinois.

Aug. 2, 1985.

As Modified Nov. 18, 1985 and Jan. 30, 1986.

Detroit, Mich., John P. Nicoara, Nicoara & Steagall, Peoria, Ill., for Sandoval, et. al.

Frank Cicero, Jr., Jean Reed-Haynes, Kirkland & Ellis, Chicago, Ill., Donald E. Scott, Kirkland & Ellis, Washington, D.C., J. Landis Martin, Bruce A. Hubbard, John L. Watson, Kirland and Ellis, Denver, Colo., Tim Swain, Swain, Hartshorn & Scott, Peoria, Ill., for H. Simmons.

Tom Thomas, Kolodey, Dooley & Yeager, Dallas, Tex., Tim Swain, Swain, Hartshorn & Scott, Peoria, Ill., for G. Simmons.

Robert F. Henderson, Dennis R. Cassell, Allen, Knuths & Cassell, Dallas, Tex., for M. Snetzer.

James L. Truitt, Gerald C. Connley, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., Tim Swain, Swain, Hartshorn & Scott, Peoria, Ill., for J. Sommer & A. Galbraith.

F. Louis Behrends Law Office, Peoria, Ill., for Keystone Consolidated & Nat. Lock.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MIHM, District Judge.

This action was previously consolidated with *Jefferson Trust and Savings Bank of Peoria v. Simmons, et al* (83–1101) and *Donovan v. Simmons, et al* (83–1115). Stipulated settlement agreements were entered into in both of those actions and were approved by the Court.

The Court granted Plaintiffs' motion for separate trials on the issues of liability and appropriate relief. The issues of liability were tried before the Court on February 11–15, 1985. During the trial of this case, the Court granted Motions for Judgment of Dismissal pursuant to Rule 41(b) of the Federal Rules of Civil Procedure on the claims brought pursuant to sections 404(a)(1)(C) and 405(c) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104(a)(1)(C) and 1105(c). As to the remainder of the claims, the Court declined to render judgment until the close of all the evidence.

Irving Friedman, Katz, Friedman, Schur & Eagle, Chicago, Ill., Gerald Feder, Nik Edes, Lorraine Pratte, David R. Levin, Feder and Edes, Washington, D.C., Jordan Rossen, Gen. Counsel, William Wertheimer, Asst. Gen. Counsel, United Auto Workers,

The Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

*The Parties, the Principals, and the Trusts*

1. Plaintiffs are six former or current employees of the National Lock Division ("National Lock") of Keystone Consolidated Industries, Inc. ("Keystone" or "KCI"). When used in this document, "KCI," "Keystone," and "Keystone Consolidated Industries," are all abbreviations for Keystone Consolidated Industries, Inc.

2. Each Plaintiff is a participant in the National Lock Division Pension Plan for Hourly Employees ("Pension Plan"), which has been maintained by Keystone during the period relevant to these proceedings.

3. Harold Simmons joined the Keystone Consolidated Industries, Inc. board of directors in February, 1982.

4. In 1964 Harold Simmons formed a trust for the benefit of his children and grandchildren ("the Simmons Trust"). Harold Simmons is the sole trustee of the Simmons Trust.

5. Since 1982, the only substantial asset of the Simmons Trust is approximately 99% of the stock of Contran Corporation ("Contran").

6. At all times relevant herein, Contran maintained two employee pension benefit plans: the Retirement Trust for Employees of Contran Corporation and the Profit Sharing Trust for Employees of Contran Corporation ("the Contran Trusts").

7. An original Schedule 13D concerning the stock of National City Lines, Inc. ("National"), signed by Harold Simmons and Michael Snetzer, was filed with the U.S. Securities and Exchange Commission ("SEC") on April 7, 1980 on behalf of NOA, Inc., Valhi, Inc., Contran, Flight Proficiency and Harold Simmons.

8. On April 10, 1980, Harold Simmons and Glenn Simmons, Harold Simmons' brother, met with representatives of National to discuss the possibility of Harold Simmons' nomination to the Boards of Directors of National and T.I.M.E.–DC ("TIME–DC"), which was then a subsidiary of National. In May 1980, Harold Simmons became a director of both National and TIME–DC. Within seven months, Glenn Simmons and Michael Snetzer also became directors.

9. Throughout 1980, certain subsidiaries of Contran obtained approximately 91% of the outstanding common stock of National through open market purchases and through tender offer. By the end of 1980, Harold Simmons was elected to the position of President and Chief Executive Officer of National and Chairman of the Boards of TIME–DC and National.

10. In December 1980, Harold Simmons was elected a director and Chairman of the Board of NLI Corp. ("NLI"), a wholly-owned subsidiary of TIME–DC; Glenn Simmons was elected a director and President of NLI; and Michael Snetzer was elected a director, Vice President and Treasurer of NLI.

11. On March 16, 1981, at a special meeting of the Executive Committee of the TIME–DC Board of Directors, attended only by Harold Simmons, Glenn Simmons and Hugh C. Shurtleff, the Committee accepted the resignation of the TIME–DC Retirement Committee and the Trustees of the TIME–DC Pension Trust ("TIME–DC Trust") and appointed Harold Simmons, Glenn Simmons and Michael Snetzer to the resulting vacancies.

12. On May 5, 1981, National purchased all of the issued and outstanding stock of Gibson Products of Shreveport, Inc. ("Gibson"). On the same day, Gibson combined its two employee benefit plans, thereby forming the Profit Sharing Plan and Trust for Employees of Gibson Products of Shreveport, Inc. ("Gibson Trust"). Harold Simmons, Glenn Simmons and Al Knutson were appointed to administer the Gibson Trust.

13. On September 8, 1981, National announced its intention to make a tender offer to purchase all outstanding shares of

LLC Corporation ("LLC"). It also filed suit against LLC in that regard.

14. On September 14, 1981, National made a cash offer to purchase any and all outstanding shares of LLC's common stock.

15. On October 30, 1981, an LLC subsidiary filed a petition for injunctive relief against National, Contran, Harold Simmons, Michael Snetzer and Glenn Simmons, regarding National's tender offer.

16. On November 10, 1981, National, Harold Simmons and other individuals announced that they were soliciting proxies for a slate of directors in opposition to the nominees of LLC's Board of Directors for an election to be held November 17, 1981.

17. On November 16, 1981, LLC filed suit against National, Harold Simmons and Contran, seeking to enjoin them from voting any proxies received by them in their proxy contest.

18. By November 17, 1981, Harold Simmons and persons associated with him held six seats on LLC's 15-member Board of Directors.

19. By November 23, 1981, Contran was the beneficial owner of approximately 43% of LLC's outstanding shares of common stock.

20. In October 1982, Michael Snetzer became Chairman of the Board of LLC. Effective January 18, 1983, Harold Simmons replaced him. Snetzer remained as a director.

21. Since at least September 1981, Harold Simmons has been the sole trustee of the Simmons Trust; a director and the President of Contran; Chief Executive Officer, Chairman of the Board and a director of National; director of TIME–DC; a Trustee of the Contran Trusts; the President and director of NOA, a subsidiary of Contran; a Trustee of the TIME–DC Trust; and a Trustee (until March 24, 1984) of the Gibson Trust.

22. At all relevant times herein, Harold Simmons has frequently engaged in a practice of seeking to take control of companies through stock purchases or other means.

Harold Simmons involves himself, his companies and trusts over which he exercises investment authority in corporate control contests.

23. Glenn Simmons is the brother of Harold Simmons. Since at least September 1981, Glenn Simmons has been Vice President and a director of Contran; President and director of National; Vice President and director of NOA; a director of TIME–DC; a Trustee of the Contran Trusts; a Trustee of the TIME–DC Trust; and a Trustee (until March 24, 1984) of the Gibson Trust.

24. Since at least September 1981, Michael Snetzer has been a Vice President, Treasurer and director of Contran; Financial Vice President and Treasurer of National; a director of TIME–DC; and a Trustee of the TIME–DC Trust.

25. At all times relevant herein, Harold Simmons has been the official with responsibility for setting investment policy for Contran; National; NOA; NLI Corporation, a National subsidiary; and Keycon Insurance, Ltd., a Keystone subsidiary (collectively "the Simmons Companies"). He also set the investment policy for and exercised discretionary control over the assets of TIME–DC, Contran and Gibson Trusts. Harold Simmons did not have investment authority for LLC and Keystone.

26. An original schedule 13D concerning the common stock of Keystone, signed by Harold Simmons and Michael Snetzer, was filed on November 16, 1981, on behalf of National, NOA, Southwest Louisiana, Dixie Rice, Contran, Contran Holding Company, TIME–DC Trust, the Contran Trusts and Harold Simmons, individually. This schedule 13D and amendments thereto reflect that between September 14, 1981 and August 31, 1982, NLI was added to the list of those that had purchased Keystone stock.

27. Harold Simmons and Michael Snetzer announced in November 1981 that National might attempt to acquire control of Keystone by purchasing additional shares, and that National might seek to obtain

possible majority representation on Keystone's Board of Directors. Subsequently, Harold Simmons and Michael Snetzer announced that National may be deemed to be the beneficial owner of approximately 54.1% of the outstanding shares of Keystone common stock. As of September 1982 National beneficially owned or controlled more than 50% of the outstanding voting securities of Keystone.

28. In November 1981 Harold Simmons and Michael Snetzer reported in Amendment No. 2 to the Keystone 13D that NLI's purchases of Keystone's shares were to be funded by a credit agreement with Mercantile National Bank at Dallas ("Mercantile").

29. On February 25, 1982, at a special meeting of Keystone's stockholders, Harold Simmons, Glenn Simmons and Snetzer were elected directors of Keystone; Glenn Simmons was elected President of Keystone; and Snetzer was appointed to serve on Keystone's Audit and Executive Committees.

30. At all times relevant herein, the principal executive offices of Contran, National, NOA, NLI, Dixie Rice Agricultural Corp., and Southwest Louisiana Land Company were located at 4835 LBJ Freeway, Suite 600, Dallas, Texas 75234.

31. At all times relevant herein, the business address of the Contran, Gibson and TIME–DC Trusts has been 4835 LBJ Freeway, Suite 600, Dallas, Texas.

32. The principal executive offices of Keystone were moved from Peoria, Illinois to 4835 LBJ Freeway, Suite 600, Dallas, Texas on or about June 1, 1982.

33. The assets of several of Keystone's employee pension benefit plans, including those of the Pension Plan, are held as part of the Keystone Master Pension Trust ("KMPT"), and have been so held at all times relevant herein.

34. The KMPT was established by an agreement dated May 1, 1977 between Keystone and the Northern Trust Company of Chicago, Illinois, which was named as the trustee under the agreement. It was signed on behalf of Keystone by Alex Galbraith. This agreement provides for a Corporate Committee to be appointed by the Keystone Board of Directors. The committee, *inter alia,* is the named fiduciary for purposes of ERISA and establishes investment policy. Under the agreement, the Northern Trust Company was to hold the trust fund as a single, co-mingled fund, but for bookkeeping purposes, was to maintain an account which reflected the interest of each plan with assets in the trust fund.

35. Keystone established the Keystone Master Deferred Incentive Trust ("KDIT") to hold the assets of the Keystone Deferred Incentive Plans. The KDIT was established by an agreement dated May 1, 1977 between Keystone and the Northern Trust Company of Chicago, Illinois, which was named as trustee under the agreement. This agreement was signed on behalf of Keystone by Alex Galbraith. This agreement provided for the appointment of a Corporate Committee by the Keystone Board of Directors. The committee, *inter alia,* is the named fiduciary for purposes of ERISA and establishes investment policy.

36. Since 1980, the Jefferson Trust and Savings Bank of Peoria ("Jefferson Bank") has served as successor trustee of KDIT.

37. Alex Galbraith became associated with KCI in 1972, almost ten years before Harold Simmons' involvement with the Company. Galbraith served as chief financial officer for KCI until March of 1984 when he became chief officer for Keycon Industries, Inc.

38. John Sommer began his career with KCI in 1935 and retired in 1974 as president. Since 1974 his exclusive relationship with KCI has been as a member of the board of directors and of the Corporate Committee.

39. Galbraith first became associated with the Corporate Committee in 1976 when he was asked to analyze the investment results of the investment managers retained by the Committee and to recommend changes in the investment managers.

40. In 1977 Alex Galbraith and John Sommer were appointed by the Keystone

Board of Directors to the Corporate Committee, and the Board adopted resolutions designating the Corporate Committee as the fiduciary responsible for planned investments for the plans within the KDIT and KMPT. Galbraith and Sommer have served on the Corporate Committee continuously since that time.

41. Galbraith is a vested participant in employee benefit plans whose assets are held by the Keystone Deferred Incentive Trust and the Keystone Master Pension Trust. Galbraith holds the largest interest of any Keystone employee in the Keystone Deferred Incentive Plan.

42. Galbraith does not now have and never has had an association or affiliation of any sort with any of the following entities: Contran, Dixie Rice, National City Lines, LLC, NOA, Southwest Louisiana Land Company, Gibson Products, NLI, T.I. M.E.–D.C., and Amalgamated Sugar. He has never had any association with any Simmons' affiliated trust or corporate entity except KCI, Keycon Insurance, a KCI subsidiary, and now Keycon Industries, Inc.

43. Alex Galbraith moved from Illinois to Dallas, Texas in June 1982.

44. Sommer receives no compensation for his activity as a member of the Corporate Committee and receives a total annual compensation of $7,500 as a member of the board of directors. That money does not constitute a significant portion of his current income.

45. Sommer is a beneficiary of plans whose assets are held and invested as part of the Keystone Master Pension Trust.

46. Sommer's only involvement with Harold Simmons or any of his affiliated entities has been through his concurrent membership with Simmons on the Corporate Committee and, for a period, on the Board of Directors of KCI.

*Appointment of Harold Simmons to the Corporate Committee and his Assumption of Management Authority*

47. Several additional members were added to the Corporate Committee subse-

quent to May 1, 1977. As of February 25, 1982 the Corporate Committee had seven members. The number remained at seven until the reconstitution of the Committee on April 22, 1982.

48. Keystone's operations had experienced severe losses in 1981 and early 1982, and the employee benefit plans within the Keystone Master Pension Trust had substantial unfunded liabilities.

49. The contribution obligations of Keystone Consolidated Industries to the KMPT for the year ended June 30, 1982, as reflected on the Forms 5500, was approximately $11,400,000.

50. The aggregate future contribution obligations of Keystone Consolidated Industries on the plans whose assets were held by the KMPT as reflected in the 1982 annual report were approximately $129 million for vested benefits and approximately $11 million for nonvested benefits, constituting an aggregate obligation of approximately $140 million.

51. When the Corporate Committee met on February 24, 1982, Alex Galbraith reported to the Committee that he had conferred by phone with all money managers, and that all seemed to have a good understanding of the market situation. Galbraith stated that he did not recommend the Committee make any changes at that time. The Committee agreed with Galbraith's recommendations and decided to reevaluate the situation when investment results were reported at the March and April meetings of the Committee.

52. When the Corporate Committee met on April 21, 1982, Galbraith reported that Mr. Brokaw seemed to be less in control of the investments of Brokaw Capital Management (the KMPT and KDIT equity manager) than he had been in prior, more successful years.

53. The record reflects that the Corporate Committee met regularly up until April 22, 1982. Written minutes of those meetings were kept by the designated Secretary to the Committee. At the meetings, the Committee, *inter alia*, reviewed and

discussed written summaries of the performance of the various investment managers retained by the Committee and established investment guidelines for those managers.

54. When the Keystone Board of Directors met on April 22, 1982, in response to advice from Glenn Simmons, the Board adopted a resolution authorizing and directing the officers of Keystone to execute documents necessary to amend, restate and continue the plans and trusts. The Board also adopted a resolution terminating previous appointments to the Corporate Committee, appointing Harold Simmons to be Chairman, and reappointing Alex Galbraith and John Sommer as members of the Corporate Committee; appointing Warren Reynolds as a non-voting member and the Secretary to the Committee; authorizing the Committee to continue to employ, supervise and remove investment managers, investment trustees or insurance companies as required from time to time and to perform such other duties as authorized in the pension plans included under the Master Pension Trust Agreement; and ratifying and confirming all prior actions of the Committee with regard to investments of Trust Funds and appointments or changes in investment managers. All of the directors present, including Glenn Simmons and Michael Snetzer, voted in favor of the resolution.

55. Two directors of KCI, J. Walter Tucker and Stanley Vermeil, nominated Harold Simmons to fill the remaining seat on the Corporate Committee. Tucker and Vermeil were independent of the Simmons interests.

56. On April 22, 1982 Glenn Simmons and Snetzer knew of and were familiar with Harold Simmons' principals of fundamental securities analysis. They were aware of the high degree of skill that Harold Simmons had shown in applying his investment method to the portfolios of employee benefit plans. They were aware that Harold Simmons was successful in both managing the downside risk of the plans and achieving long term gains for the plans.

57. Glenn Simmons and Snetzer were not at any time members of the Corporate Committee. They were not at any time investment managers for the KMPT.

58. At the time Harold Simmons was named to the Corporate Committee and Galbraith and Sommer were reappointed to the Corporate Committee in April of 1982, KCI had no reason to doubt the competence, integrity or responsibility of any of these men.

59. In late April or early May of 1982, Harold Simmons approached Alex Galbraith and raised the possibility that Harold Simmons be permitted to make initial investment decisions on behalf of the Corporate Committee.

60. Galbraith sought clarification from Northern Trust Company (the Trustee for the plans at the time) as to the Corporate Committee's authority to delegate initial investment decisions to Harold Simmons and was advised that the Corporate Committee was empowered to assume full management of all pension funds under the trust agreement. Galbraith received this information on June 8, 1982.

61. Galbraith did not check to see if the KMPT trust documents required that the delegation of investment authority to Harold Simmons be in writing.

62. Prior to October 28, 1982, the KMPT Trust Agreement did not address any administrative aspect of the internal functioning of the Corporate Committee. The KMPT trust document did not provide that an oral delegation of investment authority could be made by the Corporate Committee as a body to any of its members individually. In fact, there was no provision in the trust agreement prohibiting one Corporate Committee member from assuming such responsibility.

63. Prior to the Fall of 1981, Galbraith had never heard of Harold Simmons. He first learned of Simmons' involvement with KCI when he was told by the Chief Executive Officer of KCI of a Schedule 13D filing

indicating that Simmons had increased his stock ownership in KCI to over five percent (5%).

64. Prior to delegation of initial investment authority to Harold Simmons, Alex Galbraith formed an opinion of Harold Simmons' ability on the basis of statements made to Galbraith by a bank officer that Harold Simmons checked out fine and had the reputation of being an astute investor; Galbraith's first-hand exposure to Harold Simmons during the period since the fall of 1981 when the Simmons' companies became significant investors in KCI; a statement from Michael Snetzer that Harold Simmons successfully managed the investment of certain Contran trusts with a rate of return of 60 to 70 percent per year over the last several years; and confirmation by Glenn Simmons of that investment return.

65. In May and/or early June of 1982 Galbraith spoke with Sommer regarding Harold Simmons' proposal that he be given responsibility to manage investment of the plan assets. They discussed at that time Galbraith's knowledge of Harold Simmons.

66. Sometime after June 8, 1982, Messrs. Sommer and Galbraith both engaged in a telephone conversation with Harold Simmons in which they indicated to him that they had reviewed his request and had determined that it was sensible and a good idea that he should assume initial investment responsibility.

67. Galbraith assumed de facto responsibility for administrative duties of the Corporate Committee.

68. Glenn Simmons, Snetzer and Keystone did not object to Harold Simmons' taking over management of the assets of the KMPT and KDIT.

69. On June 25, 1982, the Corporate Committee terminated all investment management agreements.

70. The fees paid to outside investment managers had been approximately $350,000 per year up until that time. Bringing the investment management functions "in house" relieved the trust funds of this expense.

71. In part, allocation of primary investment responsibility to Harold Simmons was intended to benefit the KMPT by increasing its rate of return on investments.

72. In a letter dated June 25, 1982, Galbraith informed Robert Grimshaw of Northern Trust Company of recent actions which had taken place with regard to the KMPT including the change in the composition of the Corporate Committee and the removal of the KMPT's investment managers.

73. Galbraith did not inform Grimshaw that the Corporate Committee had delegated its investment authority to Harold Simmons.

74. Prior to Harold Simmons' assumption of investment authority, members of the Corporate Committee had received only monthly reports concerning the investment activities of the Trust and those were often not received until approximately forty-five days after the close of each month. After Harold Simmons assumed investment responsibility for the KMPT, the other Corporate Committee members received more frequent and more detailed reports than they had previously received. These reports included information on the KMPT's portfolio composition and liquidity needs.

75. Galbraith received current daily trading reports indicating the securities that had been bought or sold and the prices with respect thereto.

76. Galbraith read the reports upon receipt. If purchases of securities with which he was not familiar were indicated, it was his practice to obtain published materials or other information to familiarize himself with the investment. Galbraith periodically reviewed Harold Simmons' investment files to obtain additional information on investments made by Simmons on behalf of the KMPT.

77. In certain circumstances Galbraith would investigate other aspects of a company in which the KMPT invested, such as their proprietary technology. With respect to National Standard Corp., for example, he engaged the KCI engineering department

to advise him as to their views about a particular type of powder metal technology.

78. Sommer received some daily reports but generally received current weekly reports. Sommer also received cumulative records kept by KCI listing purchases, sales, commission rates, and prices at relevant dates. Sommer did not carefully review the materials he received. He just took "a quick look."

79. Harold Simmons himself obtained and utilized both weekly and monthly reports of the cash availability, cash needs, and portfolio status of the KMPT.

80. Contrary to prior practice, there were no meetings of the Corporate Committee between April 22, 1982 and October 3, 1982.

81. Harold Simmons is not aware of any written policy with respect to the investment of the assets of the KMPT.

82. Harold Simmons has not committed his investment policy to writing.

*Harold Simmons' Investments for the KMPT Prior to September 1982 and his Interest in Amalgamated*

83. In contrast to paid investment managers, who commonly liquidate the previous manager's portfolio upon undertaking a new investment responsibility, Harold Simmons did not liquidate the KMPT's investment portfolio at the start of his management tenure. Mr. Simmons wanted to avoid unnecessary costs or losses to the Trust.

84. The Form 5500 for the Pension Plan for the plan year ending June 30, 1982, reflects net assets of $9,778,002, including a receivable for contributions from Keystone in the amount of approximately $3,267,900. Attached to the Form 5500 is a Summary of Assets held in the KMPT as of June 30, 1982. The Summary reflects KMPT assets of $33,311,210, of which $6,634,689, or 19.92% was held for the Pension Plan.

85. Harold Simmons began to make significant changes in the KMPT's stock portfolio during July 1982. His investment strategy involved buying stocks in depressed industries where the price was likely to improve when the general stock market turned up.

86. Harold Simmons also utilized an investment strategy of purchasing "special situation" stocks in which he had identified unusual economic values in relation to their market prices. Harold Simmons' method in selecting a special situation stock followed principles of fundamental securities analysis. This method of analysis, as Mr. Simmons applied it, concentrated on the economic strength and underlying asset values of a company. Harold Simmons believed that this method tended to protect the stock investment from any large downside risk of loss.

87. One aspect of Harold Simmons' investment method was the perceived need to concentrate his investment in relatively few companies. He made his investments in companies that he had studied carefully and in which he had found substantial values not widely recognized by other investors and not reflected in the stock market prices of the securities.

88. Harold Simmons imposed upon himself a 25 percent concentration limit for any single security when making investments on behalf of the KMPT and other ERISA-governed plans as to which he exercised investment authority.

89. Harold Simmons had shown a high degree of skill prior to 1982 in applying his investment method to the portfolios of employee benefit plans. For example, his seven-year performance for the Contran Plans had outperformed the general stock market in every year with no losing year. His successful method and performance were also displayed in the T.I.M.E.–D.C. Pension Trust prior to 1982.

90. Harold Simmons identified the Amalgamated Sugar Company ("Amalgamated") in 1981 as a special situation stock that was suitable for investment. Mr. Simmons had followed the sugar industry since 1974 and had closely analyzed Amalgamated's financial statements from early 1981

onward. He concluded that the intrinsic asset value of the stock was considerably higher than its public trading price. Before the summer of 1982, Harold Simmons also learned that Congress had reenacted a price support program for the U.S. sugar industry. In Harold Simmons' view, the federal price supports practically eliminated any risk that Amalgamated would incur a loss in its sugar operations for a period of at least five years.

91. Harold Simmons had directed the purchase of Amalgamated stock by various employee benefit plans and affiliated companies since July 1981, even before his affiliation with KCI or with the Keystone plans.

92. On September 14, 1981, an original schedule 13D, signed by Harold Simmons and Michael Snetzer, concerning the common stock of The Amalgamated Sugar Company, was filed on behalf of National, NOA, Southwest Louisiana Land Company, Dixie Rice Agricultural Corp., Contran, Contran Holding Company, and Harold Simmons, individually ("the reporting persons"). This schedule 13D and amendments thereto reflect that between July 17, 1981 and July 15, 1982, added to the list of reporting persons were, *inter alia*, TIME–DC Trust, Gibson Trust, NLI, Keycon and Keystone and that the various reporting persons purchased shares of Amalgamated at prices ranging from $38.25 to $50.00.

93. In Amendments to the Amalgamated 13D, Harold Simmons and Michael Snetzer reported that certain of the Simmons' Companies' purchases of Amalgamated stock were in part funded by credit agreements with Mercantile.

94. Galbraith had become interested in Amalgamated stock as a possible investment for the KMPT in early 1982. At that time he requested and received from Coopers & Lybrand Amalgamated's annual reports. He also received and reviewed Amalgamated's Form 10–K and other information including Standard & Poor's reports.

95. Galbraith first learned of purchases of Amalgamated stock on behalf of the KMPT in July of 1982. As of that date, he engaged in further investigation of Amalgamated stock.

96. Galbraith's curiosity about Amalgamated was triggered because, although Amalgamated and Keystone were substantially similar in that they operated in mature industries usually plagued by slow growth and old plants and although both were subject to fluctuations in the market price of raw materials, Amalgamated managed to be profitable even when the sugar industry was in a down part of its business cycle. Galbraith knew that Amalgamated was the low cost producer in its industry. Additionally, he considered that the Sugar Act of 1981 lent stability and protection to domestic sugar prices.

97. In February 1982, Harold Simmons offered to fill a recent vacancy on Amalgamated's Board of Directors. In March 1982, Arthur Benning, Chairman and Chief Executive Officer of Amalgamated, communicated to Simmons the Amalgamated Board's determination that it would not be advisable to have Simmons as a director.

98. By letter dated April 23, 1982, Harold Simmons informed Horace Havemeyer, Jr., one of the directors of Amalgamated, that he would be interested in purchasing Havemeyer's block of Amalgamated stock.

99. By letter dated May 3, 1982, Harold Simmons informed Mr. R.H. Burton, a director of Amalgamated, that he might be interested in purchasing Burton's Amalgamated stock if Burton ever considered selling. Simmons also noted his earlier unaccepted request to be considered for the Amalgamated Board of Directors.

100. By letter dated May 19, 1982, Harold Simmons informed Spencer Eccles—Chairman of First Security Corporation in Salt Lake City, a director of Amalgamated—that if he or his bank ever considered selling a block of Amalgamated stock, Simmons would be interested in buying.

101. In July 1982, Harold Simmons used assets of the KMPT to purchase 429,400

shares of stock in 22 companies for a total cost of $7,120,677.

102. The first time Harold Simmons used assets of the KMPT to purchase Amalgamated stock was on July 14, 1982 at prices of $49.125 and $49.50. In Amendment No. 9 to the Amalgamated 13D, dated July 15, 1982 and signed by Harold Simmons, Alex Galbraith, and Michael Snetzer, the KMPT was added to the list of reporting persons who had purchased Amalgamated stock.

103. Amendment No. 10 to the Amalgamated 13D dated July 22, 1982, was signed by Harold Simmons, Michael Snetzer and Alex Galbraith. Harold Simmons purchased Amalgamated shares for Keycon and the KMPT between July 16 and 20, 1982 at prices ranging from $50.00 to $52.75.

104. In August 1982 Harold Simmons purchased 17,400 Amalgamated shares for Keycon at prices ranging from $48.375 to $53.00.

105. In August 1982 Harold Simmons used almost $1.4 million of KMPT assets to purchase 130,000 shares of stock—but no Amalgamated stock. Because of his heavy stock purchases in July and August, Simmons virtually depleted the cash balances in the KMPT, i.e., as of August 31, 1982 there was only slightly more than $80,000 in cash and cash equivalents.

106. As of September 2, 1982: NLI held 182,200 shares of Amalgamated common stock and had paid an average of $48.128 for each such share; NOA held 104,500 shares of Amalgamated and had paid an average of $43.833 for each such share; the TIME–DC Trust held 32,900 shares of Amalgamated and had paid an average of $43.777 for each such share; the Gibson Trust held 1,200 shares of Amalgamated and had paid an average of $42.458 for each such share; Keycon held 27,000 shares of Amalgamated and had paid an average of $50.99 for each such share; and the KMPT held 22,100 shares of Amalgamated and had paid an average of $51.415 for each such share.

107. As of September 2, 1982, NLI, NOA and Keycon held 313,700 shares of Amalgamated. These shares represented about 15.50% of the total number of outstanding Amalgamated shares as reported in Amalgamated's quarterly report on Form 10–Q for the quarter ended June 28, 1982 ("the June 1982 Form 10–Q"). NLI, NOA and Keycon purchased these shares for approximately $14,726,500 (exclusive of commissions).

108. As of September 2, 1982, the KMPT held 22,100 shares of Amalgamated. These shares represented about 1.1% of the total number of Amalgamated shares as reported in the June 1982 Form 10–Q. The KMPT purchased these Amalgamated shares for approximately $1,136,262.50 (exclusive of commissions).

*The Amalgamated—SKZ Merger Proposal*

109. Amalgamated's board of directors had hired First Boston Corporation in early 1981 to study and propose a major restructuring of the company, including a possible sale of the company. The hiring of First Boston preceded any purchase of Amalgamated stock by the Simmons interests in 1981 and 1982.

110. During most of 1982, First Boston looked for potential purchasers of Amalgamated. First Boston proposed to structure a "leveraged buy-out." A "leveraged buy-out" would be a transaction in which the purchaser would buy Amalgamated primarily with Amalgamated's own assets and earnings.

111. Amalgamated's decision in March of 1982 to authorize First Boston Corporation to explore the possibility of a sale of Amalgamated and the resultant SKZ merger proposal were in part a response to the possibility that Harold Simmons might be able to acquire working control of Amalgamated through open market purchases of shares without acquiring 100% of the shares outstanding and without paying a control premium. First Boston approached 40 to 50 companies seeking a buyer, but it never approached Harold Simmons or one of his Companies.

112. On September 2, 1982, Amalgamated announced a Merger Agreement with SKZ Holdings, Inc., a company newly formed by investor Selim Zilkha for purposes of the merger. The agreement provided for the merger of Mina, Inc. into Amalgamated, the surviving company. The successful completion of the SKZ merger proposal was to result in SKZ's control of Amalgamated.

113. The proposed SKZ/Amalgamated merger was structured to be a leveraged but-out. It also was structured to be an involuntary "freeze-out" in which Amalgamated's shareholders would receive $60 per share in cash, plus a $1.25 per share dividend, payable to shareholders of record as of October 15, 1982, regardless of whether they wished to sell their stock.

114. On September 2, 1982, Amalgamated also entered into a Stock Option Agreement pursuant to which SKZ was granted the unconditional option to purchase up to 374,000 shares of Amalgamated at $60 per share.

115. On September 2, 1982, Amalgamated Directors A.E. Benning, R.H. Burton, Spencer F. Eccles and Horace Havemeyer, Jr. entered into separate Shareholder Agreements with SKZ, which provided that they would vote all shares they beneficially owned (which constituted 16.1% of the approximately two million shares outstanding as of September 2, 1982) in favor of the SKZ merger proposal and that they would not dispose of their shares to anyone but SKZ.

116. Amalgamated announced that a special shareholders meeting to vote on the proposed merger had been scheduled for October 19, 1982.

*Harold Simmons' Amalgamated Stock Investments for the KMPT During September 1982*

117. On September 2, 1982 Harold Simmons learned of and decided to oppose the SKZ merger proposal.

118. Harold Simmons thought that the SKZ merger price was too low. He believed that the Amalgamated stock held by his affiliated companies and by the employee benefit plans had an intrinsic value greater than $61.25 per share. If SKZ's efforts to control Amalgamated succeeded and the merger was consumated, Harold Simmons believed that he would stand to lose at least $90 to $100 for every Amalgamated share then owned by the Simmons Companies and Trusts over which he exercised investment authority. He intended to vote the Amalgamated shares held by the Simmons Companies and Trusts over which he exercised investment authority against the merger.

119. Harold Simmons believed that the proposed SKZ/Amalgamated merger confirmed his own analysis of Amalgamated's intrinsic value. Mr. Simmons believed that, even if the SKZ/Amalgamated merger proposal were defeated, Amalgamated stock would not in the future trade below $61.25 per share.

120. On September 2, 1982, Harold Simmons advised Mr. Benning by telephone that he intended to contest the SKZ merger proposal. Harold Simmons told Mr. Benning that the proposed $60 SKZ merger price was inadequate. Harold Simmons then offered to buy Mr. Benning's Amalgamated stock for $61 per share. Mr. Benning declined the offer.

121. On September 2, 1982, Harold Simmons told his attorneys, Michael Snetzer, Glenn Simmons and Walter Tucker that they should make plans to oppose the proposed merger with a proxy contest. Another method of opposing the merger was to buy more stock and at least Harold Simmons and Snetzer knew of that method as early as September 2nd. Another method was to file suit to enjoin the exercise of the SKZ Stock Option.

122. Harold Simmons sought to buy the Amalgamated shares owned by the First Security Corporation because "if [he] could have bought that block at $62 a share, [he thought] it would have been helpful in winning the vote against them." First Security refused Simmons' offer to purchase.

123. On September 3, 1982 Harold Simmons and Michael Snetzer met with James

Gardner, President of Mercantile, and Phillip Bankhead, a Mercantile officer. At that meeting Mr. Simmons asked Gardner for a $25 million loan for National to buy additional Amalgamated stock. Gardner told Simmons and Snetzer that the request for $25 million was $10 million above the Bank's informal loan limit. Gardner told them that a $25 million loan would not be a problem, but Gardner wanted to "farm out" anything over $15 million. Gardner told Simmons and Snetzer that the funds could be provided within 24 hours. Simmons made it clear that he wanted access to the borrowed money so that he could purchase Amalgamated stock in advance of the shareholders meeting. He intended to try to fight the acquisition by SKZ, thereby protecting his investment, specifically that in NLI and NOA. Simmons intended to purchase shares on the open market and vote those shares according to his previously stated objective to vote against the merger.

124. At no time during the September 3rd meeting and at no other time in September 1982 did Mercantile ever formally approve a $25 million loan to National or any other Simmons Company.

125. Harold Simmons used KMPT assets to purchase Amalgamated stock in September 1982 in order to defeat the SKZ attempt to take over Amalgamated and acquire a controlling interest in Amalgamated.

126. Harold Simmons used KMPT assets to purchase 162,800 shares of Amalgamated Sugar stock in September 1982 at an average share price of $61.26, or $61.363 including the brokerage commission paid to Goldman, Sachs. Including the brokerage commission, the total cost was $9,989,905. If the SKZ/Amalgamated merger had been successful, the KMPT would have received $61.25 cash per share.

127. Harold Simmons instructed his brokers to buy the Amalgamated stock with or without a proxy attached. Harold Simmons instructed his brokers to "match the high bid" for Amalgamated stock. This instruction meant that purchases of Amalgamated stock in September 1982 would be split with others, thereby precluding the Simmons' interests from purchasing all available stock. The instruction was given, at least in part, to avoid running up the market price of the stock.

128. The money used by the KMPT to buy Amalgamated stock was generated by selling other stocks in the Trust's portfolio, including stocks purchased by the previous equity manager and stocks purchased earlier that summer by Harold Simmons. A total of 483,700 shares of stock of 26 companies other than Amalgamated were sold from the KMPT stock portfolio during September for total proceeds of $11,159,044. The stock of these 26 companies was sold over a period of five business days beginning September 3, 1982. In July and August 1982 Harold Simmons used KMPT assets to buy shares of 16 of the 26 companies that he then sold in September of 1982 sales.

129. The KMPT made a net profit on the September 1982 sales, including a net profit of $130,401.91 on the sales of the sixteen stocks that Harold Simmons had purchased for the KMPT in July and August 1982.

130. In September 1982 Harold Simmons used the assets of the KMPT to purchase shares of no company other than Amalgamated. The last date in September on which he made such purchases was September 16. From September 17, 1982 through the end of that month, Harold Simmons purchased no stock with KMPT assets.

131. In his use of Trust fund assets, Harold Simmons dominated trading in Amalgamated shares on the New York Stock Exchange from September 7th through the 23rd.

132. Harold Simmons was not certain at any time after September 2nd—when he was directing the purchase of Amalgamated shares using assets of his Companies and of the Trusts over which he exercised investment authority—that the SKZ merger proposal would not be successful. In-

deed, not before September 10, 1982 did Harold Simmons know the total number of Amalgamated shares actually held or controlled by SKZ or Mr. Selim K. Zilkha.

133. Harold Simmons' purpose in selling stock from the KMPT stock portfolio during the month of September 1982 was to generate enough cash to pay for the KMPT's September purchases of Amalgamated.

134. Harold Simmons' use of KMPT assets to purchase Amalgamated stock in September 1982 was an integral part of Simmons' efforts to defeat the SKZ merger proposal in order to protect his Companies' $14.7 million investment in Amalgamated.

135. Harold Simmons purchased Amalgamated stock for the KMPT during September 1982 believing that the stock was worth substantially more than the KMPT was paying for it and believing that the stock had little, if any, downside risk of loss. Mr. Simmons had no intention at any time to harm the plans or expose them to undue risks. However, Harold Simmons' decision to purchase the Amalgamated shares for the Trusts was not made in the sole interest of the plan participants.

136. Even if Harold Simmons had been successful in defeating the merger proposal, there was no guarantee that the Amalgamated stock would not fall below the merger price after the control contest ended.

137. Harold Simmons' purchase of Amalgamated stock with KMPT assets in September 1982 was not because his affiliated companies were unable to purchase the stock. If Harold Simmons had wished to purchase the Amalgamated stock for his corporate interests during September 1982, he had funds available through the companies and their regular bankers to makes those purchases. However, the purchase of Amalgamated stock by the KMPT was of benefit to Simmons' corporate interests even if they had money available to them for purchase of Amalgamated stock since Harold Simmons was able to exercise investment authority over the stock while his companies retained their financial reserves.

138. Mercantile approved a loan to National/NLI on September 13, 1982, but only in the amount of $15 million. The purpose of the loan was to finance the acquisition of Amalgamated stock.

139. As of September 1982 National beneficially owned or controlled more than 50% of the outstanding voting securities of Keystone. On September 9, 1982, in Amendment No. 11 to the Amalgamated 13D, signed by Harold Simmons, Michael Snetzer and Alex Galbraith, it was reported that Keystone may be deemed to be controlled by National and those persons deemed to control National.

140. Amendment No. 11 also reported the SKZ merger proposal, including the $60 per share purchase price and that National had filed suit that day in federal district court against Amalgamated, SKZ and others seeking, *inter alia*, to enjoin the exercise of the SKZ option to purchase 374,000 shares. It also reported that National had determined to oppose the proposed merger and to solicit proxies to be voted in opposition to the transaction at a special meeting of Amalgamated's shareholders scheduled for October 19, 1982.

141. Amendment No. 11 also reported that:

A majority of the members of the Keystone Corporate Committee—Employee Benefit Plans ... has the power to vote and to direct the disposition of the Shares held by the Keystone Trust. The Corporate Committee has informally delegated to Harold C. Simmons the authority to make investment decisions on behalf of the Corporate Committee, subject to periodic review by the other committee members. Each member of the Corporate Committee disclaims beneficial ownership of the Shares owned by the Keystone Trust except to the extent of his vested beneficial interest therein.

142. In a press release dated September 9, 1982, National stated that it planned to file preliminary proxy solicitation material with the SEC to be used for the solicitation of proxies in opposition to the proposed

merger and that it expected to mail its proxy materials as soon as practicable. However, they were never mailed.

143. Preliminary proxy solicitation material relating to National's opposition to the proposed Amalgamated/SKZ merger indicates that National would be soliciting proxies to be voted against the merger and that the Board of Directors of Amalgamated had fixed September 20, 1982 as the record date for determination of shareholders entitled to vote at the October 19, 1982 special meeting.

144. The record does not reflect any specific evidence that, in early September 1982 any of the defendants were aware of any minimum number of days before September 20, 1982 by which Amalgamated stock had to be purchased in order to have it registered for the scheduled October shareholders' meeting.

145. Most of the Amalgamated stock that was purchased in September 1982 could not be voted on the proposed SKZ/Amalgamated merger because the stock was bought too late in relation to Amalgamated's stock record date for the shareholder meeting at which the merger vote would be taken.

146. Alex Galbraith learned that National was intending to oppose the SKZ merger proposal and to solicit proxies in that regard on or before September 9, 1982, when he signed Amendment No. 11 to the Amalgamated 13D.

147. On or before September 10, 1982 Alex Galbraith asked Sandra Myers to call the Jefferson Bank about making certain that Amalgamated shares purchased by Harold Simmons with KDIT assets would be registered by September 20, 1982, so they could be voted at the October 19, 1982 shareholders' meeting.

148. On September 10, 1982, Sandra Myers twice spoke to Dale Sielaff, Vice President and Senior Trust Officer of the Jefferson Bank. In the first conversation, Myers told Sielaff that Alex Galbraith had asked her to call the Bank because there was a series of transactions that required

special attention. Myers told Sielaff that certain assets in the KDIT would be liquidated and that the proceeds would be invested in Amalgamated; that their broker had advised them to be sure to settle in street name; and that the Bank might be asked to settle some transactions early. Myers apprised Sielaff of the record date and the date of the shareholders' meeting. In the second conversation, Sielaff told Myers that he wanted to be kept advised of purchases and sales.

149. On September 13, 1982 Dale Sielaff had a telephone conversation with Alex Galbraith concerning Sielaff's conversations with Sandra Myers. Sielaff stated that the Bank had already consulted with counsel and that he was confident that the Corporate Committee had also met with their ERISA counsel concerning the Amalgamated transactions. Sielaff stated that the Bank felt it was important to notify the Corporate Committee about ERISA issues that the Bank felt the Committee needed to address with respect to sole benefits, exclusive purpose, diversification, prudence, prohibited transactions, and parties in interest. Sielaff stated that the Bank had concerns about fiduciary and co-fiduciary responsibilities.

150. Sielaff and Michael Crecco, a Jefferson Bank Trust Officer, met with Galbraith on September 16, 1982. Galbraith told Sielaff and Crecco that he did not know what Harold Simmons' intentions were regarding Amalgamated purchases, and that the Corporate Committee had informally delegated decision-making authority to Simmons. Sielaff asked Galbraith if voting authority with respect to an upcoming meeting of the shareholders of Amalgamated Sugar Company was still an important objective for the purchases. Galbraith stated that it was. Galbraith said that even if the Corporate Committee did not have the voting authority under the KDIT trust document, the Jefferson Bank could be assured that its proxy would be vigorously solicited. Sielaff expressed again his ERISA concerns, i.e., sole interest, exclusive purpose, diversification, prudence, party in interest and prohibited transactions.

Galbraith stated that the Corporate Committee had not consulted ERISA counsel prior to the September 14, 1982 purchases of Amalgamated stock; that in-house counsel for Keystone was not qualified in ERISA matters; but that the Corporate Committee had, by then, September 16, consulted the firm of Kirkland & Ellis. Galbraith stated that any ERISA opinion responding to the Bank's concerns would be two or three weeks in coming.

■ 151. In September and October 1982, Kirkland & Ellis was Harold Simmons' personal and corporate counsel. Kirkland & Ellis was not counsel to the Corporate committee.

152. After the meeting, Galbraith shared the Bank's concern about future purchases of Amalgamated stock by the KDIT with Ralph End, Keystone's corporate counsel, and with Glenn Simmons. Galbraith knew then that End was not an ERISA lawyer and that End was not counsel to the KMPT or the Corporate Committee.

153. Because of their connections with Keystone and Harold Simmons, neither Ralph End nor Kirkland & Ellis were in a position to provide an independent review of Harold Simmons' use of KMPT assets to purchase Amalgamated stock. Each had obvious conflicts of interest.

154. In the fall of 1982, Galbraith was aware that Harold Simmons was Chairman and Chief Executive Officer of National, that National was owned by Contran and that Contran was owned by the 1964 Simmons Trust. In September 1982, Galbraith did not ask anyone about the propriety of Harold Simmons using KMPT assets to purchase shares of Amalgamated in light of National's position in Amalgamated.

155. During September and October 1982, Alex Galbraith was not aware that after the merger was announced Harold Simmons was using the KMPT and the KDIT assets to purchase Amalgamated stock at prices above the SKZ merger price. Galbraith did not know what Harold Simmons' intentions were with respect to

seeking to acquire control of Amalgamated when Harold Simmons was purchasing those shares. Even as recently as May 4, 1983, Galbraith could think of no reason why Harold Simmons had used KMPT assets to buy at prices above the announced merger price.

156. On September 13, 1982, Glenn Simmons testified about Harold Simmons: "He's Chairman of the [Corporate] Committee. I don't know to what extent the Committee meets or discusses. That's not in my area of effort at the present time."

157. Glenn Simmons consulted with Harold Simmons' own lawyers and Ralph End about Jefferson Bank's ERISA concerns.

158. Glenn Simmons did not believe it relevant to a determination whether the purchases of Amalgamated were solely in the interest of the participants to know that the Simmons Companies were preparing a proxy contest against SKZ's merger proposal. Glenn Simmons did not question Harold Simmons about the sales of stock from the KMPT stock portfolio to generate cash to buy Amalgamated shares.

159. On September 14, 1982 Snetzer—an Officer and Director of National—believed that, in the event of the SKZ merger was approved, National and NLI would be damaged, because—in Snetzer's opinion—the $60.00 per share merger price was below the fair value of the Amalgamated shares.

160. In September 1982 Snetzer was aware that Harold Simmons was using KMPT assets to purchase Amalgamated stock and that the purchase price the KMPT was paying was above the $60 merger price. Snetzer knew of the purchases within one day of the transaction date.

161. During September 1982 Snetzer was unaware that employees of Jefferson Bank had communicated with Alex Galbraith about the Bank's concerns over the KDIT's purchases of Amalgamated stock.

162. On September 17, 1982, the federal district court in Utah denied National's motion for a preliminary injunction against

SKZ's exercising its option to purchase 374,000 shares of Amalgamated.

164. On September 20, 1982, National unsuccessfully sought an injunction pending appeal from the Court of Appeals for the Tenth Circuit. National then sought an expedited appeal from the denial of the preliminary injunction. That was granted. The Court of Appeals indicated that it was prepared to hear oral argument on October 18 or 19, 1982, and that it contemplated that Amalgamated's special meeting of shareholders, scheduled for October 19, 1982, might be required to be postponed.

164. On September 20, 1982, SKZ exercised its option and purchased 374,000 shares of Amalgamated for $22,440,000.

165. On September 20, 1982, Dale Sielaff spoke with Glenn Simmons by telephone. Glenn Simmons stated that he had in his possession the materials that Sielaff had provided to Alex Galbraith at their meeting, and that the "Corporate Committee's counsel" was having discussions with the Bank's counsel about the Bank's ERISA concerns. Glenn Simmons stated that he would not want Jefferson Bank to take any hasty action, and that he was confident that the Bank's ERISA concerns would be put quickly and amicably to rest.

166. By letter dated September 21, 1982, Harold Simmons responded to Sielaff's inquiry about the use of KDIT assets to purchase Amalgamated stock. This letter from Harold Simmons was sent with a cover letter of the same date signed by Glenn Simmons.

167. John Sommer learned of the SKZ merger proposal when he read the letter that Harold Simmons had sent to Sielaff. Sommer had no idea what risks were associated with Simmons using KMPT's assets to purchase Amalgamated shares at prices above the $60 merger price. Sommer has never questioned Harold Simmons about the risk factors involved in any of Simmons' uses of KMPT assets.

168. On September 21, 1982, Amalgamated and SKZ filed counterclaims and third party claims against National, alleg-

ing violations of, *inter alia,* the disclosure obligations under § 13(d) of the Securities Exchange Act and provisions of ERISA.

169. In Amendment No. 14 to the Amalgamated 13D signed by Harold Simmons and others, it was reported that:

> The reporting persons may, in the event that the proposed merger is disapproved, determine to seek representations on Amalgamated's Board of Directors commensurate with their then-existing equity interest in Amalgamated....

It was also reported that "National intends to continue to seek a judicial determination of the [SKZ stock] option."

170. On Wednesday, September 22, 1982, Harold Simmons "started thinking that the odds of winning the election [re: SKZ merger proposal] and defeating the $60 offer were substantially diminished." Harold Simmons believed that the exercise of the SKZ option, on September 20, 1982, "switched the odds from the probability of us winning to the probability of them winning." Those doubts increased when Simmons found out that the Court of Appeals would probably not delay the stockholders meeting and after he read the appellate briefs.

171. As of September 23, 1982, the Simmons Companies and the Trusts over which Harold Simmons had investment authority owned a total of 622,300 shares of Amalgamated, or approximately 25.95% of then outstanding shares of Amalgamated. The largest block of these Amalgamated shares consisted of 184,900 shares held by the KMPT; the total number of Amalgamated shares owned by all the Trusts over which Harold Simmons had investment authority was 297,600 shares.

172. Between September 2nd and September 23rd, Harold Simmons spent approximately $686,000 of his Companies' money to buy 11,000 Amalgamated shares. During that same twenty-day period, Harold Simmons used in excess of $15 million of the Trusts' assets to purchase 241,400 Amalgamated shares. Of that $15 million, almost $10 million came from the KMPT

and was used to purchase 162,800 shares of Amalgamated.

*The National-Amalgamated Acquisition Agreement*

173. On September 23, 1982, Simmons discussed the possibility of purchasing all the stock of Amalgamated with Michael Snetzer and an attorney from Kirkland & Ellis. They drafted and sent a letter to Amalgamated that afternoon and received a positive response from Amalgamated that evening.

174. The transaction proposed in the September 23rd letter was wholly conceived by Harold Simmons. He decided to make a leveraged buy-out proposal for Amalgamated in the form of a voluntary tender offer.

175. On September 23, Harold Simmons sent a written proposal to Amalgamated and ceased further purchases of Amalgamated shares.

176. In a letter to the Board of Directors of Amalgamated, Harold Simmons, as the Chairman of the Board of National, proposed that National and Amalgamated enter into an agreement under which they would make a joint tender offer for any and all outstanding shares of Amalgamated's Common Stock at $65.00 per share. According to the letter, the cost of purchasing the shares was to be allocated as follows: (1) the first $77 million was to be paid by Amalgamated from "cash on hand"; (2) the next $30 million was to be paid by Amalgamated from bank loans; and (3) the "balance ... would be paid by National from its available working capital and currently available bank lines." Simmons stated in the letter that National and certain of its affiliates would agree not to tender their shares under the offer. He proposed that, following the consummation of the joint tender offer, a sufficient number of representatives of National would be elected to Amalgamated's Board of Directors so that such representatives would constitute a majority of the Board of Directors.

177. On September 27, 1982 Glenn Simmons told Dale Sielaff that he was very upset that the Bank's counsel would not assure the "Corporate Committee's counsel" that the Bank would not notify the Department of Labor about the Bank's ERISA concerns. Glenn Simmons stated that he needed 24 to 48 hours with respect to Amalgamated negotiations; that once the Department of Labor is unleashed, it can't be stopped; and that Mr. Sutkowski, counsel to the Bank, would have to stand the result of any notification to the Department of Labor. At that time, Glenn Simmons was President and a director of National.

178. In addition to Harold and Glenn Simmons, Michael Snetzer participated on behalf of National in its negotiations with Amalgamated.

179. On September 29, 1982, National, Amalgamated, SKZ and Mina entered into an Agreement, which provided for the repurchase of the 374,000 shares of Amalgamated at $60 per share, and the payment of over $3 million to SKZ for its release of Amalgamated from the Agreement of Merger.

180. On September 29, 1982, National and Amalgamated entered into an Acquisition Agreement. In that Agreement, the "Simmons Interests"—i.e., National and certain of its corporate affiliates and certain employee benefit plans maintained by such affiliates—were declared to beneficially own an aggregate of 622,300 shares of Amalgamated common stock. The express purpose of the Agreement was for National to acquire a controlling equity interest in Amalgamated. The Agreement provided that stockholders other than National and certain of its affiliates had the opportunity to receive $65 in cash per share of common stock pursuant to a self-tender offer ("Offer to Purchase"). The Acquisition Agreement provided that Amalgamated was to make a self-tender offer to purchase and retire 1,725,000 of its own shares. Amalgamated anticipated that it would have $84,000,000 available to purchase shares tendered, and that National—through an irrevocable letter of credit—would make

another $12,000,000 available to purchase shares other than those of the "Simmons Interests." Under the terms of the Acquisition Agreement, the Simmons Companies agreed not to tender their shares.

181. Although the Agreement provided that a minimum of 600,000 common shares held by the "Simmons Interests" would be retained and not tendered, it was agreed that the Simmons Interests could tender up to 297,600 shares—i.e., the Trusts' holdings of Amalgamated shares—provided that National paid to First Security Bank of Utah, the "agent for the tendering shareholders," $65 per share so tendered "in addition to the Letter of Credit provided pursuant to Section 1.2." The letter of credit was to remain outstanding until the termination of the Offer to Purchase.

182. The provision of the Acquisition Agreement permitting the plans to tender their Amalgamated stock or not to tender, as they chose, was inserted at the insistence of Harold Simmons.

183. If the Trusts over which Harold Simmons exercised investment authority were to tender their 297,600 Amalgamated shares, under the Agreement National had to pay First Security Bank of Utah about $19 million. Pursuant to the terms of the Acquisition Agreement, the $84 million Amalgamated was to provide would pay for any and all tendered shares, except those Amalgamated shares owned by the Trusts. Also, under no circumstances could the $12 million dollar letter of credit provided by National be used to pay for any shares that might be tendered by the Simmons Companies or Trusts.

184. When National entered into the Acquisition Agreement, Harold Simmons testified that he thought that National would have obtained from Mercantile the $19 million necessary to pay for the Trusts' Amalgamated shares. However, Harold Simmons did not ask Mercantile about that before he signed the Acquisition Agreement.

185. On September 29, 1982, National obtained from Mercantile a commitment to provide a $12 million letter of credit. Mer-

cantile's commitment provided that the letter of credit would expire upon the earlier of the expiration or termination date of the Offer to Purchase. Mercantile agreed to provide the letter of credit "conditional upon ... the Offer being made on substantially the terms outlined on [an Exhibit to the Bank's formal commitment which gives a brief description of the self-tender offer]...." As set forth in the Exhibit, National's sole obligation is for the $12 million letter of credit. The Exhibit does not discuss the additional $19 million dollars that National would have had to pay to First Security Bank of Utah if the Trusts were to tender their 297,600 Amalgamated shares.

186. It is clear from Mercantile's own documents that on or before September 29, 1982, National's representative had only informed Mercantile of its obligation under the Acquisition Agreement to provide a $12 million letter of credit to pay only for shares tendered other than by the Trusts. Nowhere is there a single mention in these documents that if the Trusts were to tender during the period of the Offer, National would have to provide up to $31 million.

187. It is likely that National would have been able to meet its financial obligations to Amalgamated under the Acquisition Agreement regardless of the amount of stock tendered by public shareholders or by the employee benefit plans. It is likely that the Mercantile Bank would have loaned National an additional $19 million (the value of the plans' shareholdings at $65 per share) to fund its obligation to Amalgamated in the self-tender offer if the Bank had been requested to do so. However, the Simmons Interests had no commitment from the Bank that it would do so.

188. National's financial obligation to Amalgamated with respect to any shares tendered by the plans was to make an interest-bearing loan to Amalgamated for the funds needed to buy such stock. If National had been called upon for such a loan, National would have received interest from Amalgamated on the same money

that it was borrowing at interest from Mercantile Bank.

189. Therefore, National saved no interest expense by virtue of the decision of the KMPT and other employee benefit plans not to tender their Amalgamated shares.

190. The Board of Directors of Amalgamated approved the Acquisition Agreement at a special meeting on September 29, 1982.

191. National's Acquisition Agreement with Amalgamated dated September 29, 1982 was the result of a price negotiation between the two companies. However, the level of shares held by the Simmons interests in Amalgamated was a factor in the takeover since it established Simmons as a serious investor and established his credibility with Amalgamated.

192. Hence, between September 3 and September 23, 1982, the companies affiliated with Harold Simmons benefitted from the plans' purchases of Amalgamated stock.

193. In Amendment No. 16 to the Amalgamated 13D, signed by Harold Simmons, Michael Snetzer and Alex Galbraith, and filed with the SEC on October 1, 1982, the execution of the Acquisition Agreement was reported. It was reported that National would provide up to $12 million for the purchase of shares pursuant to the Offer to Purchase, and that such funds would be evidenced by an irrevocable letter of credit issued by Mercantile. The Bank's September 29, 1982 commitment to National, signed by Phillip Bankhead for Mercantile, was attached to the amendment.

*Diversification*

194. As of September 30, 1982, the KMPT held a total of 184,900 shares of Amalgamated stock which had cost $11,128,227.50. The quarterly investment report for the KMPT Manager Account for the quarter ending September 30, 1982 stated that the value of the 184,900 shares of Amalgamated held by the KMPT on September 30, 1982 was $12,110,950 and the market value of all common stock was $15,454,175.

195. The total cost of the KMPT's investment in Amalgamated as of September 30, 1982, $11,128,227.50, represented 18.5 percent of the total adjusted market value of the assets in the KMPT Manager Accounts plus the assets held in the Dedicated Bond Fund as of that date.

196. The Amalgamated investment represented 11 to 12 percent of the KMPT's total assets at the time Harold Simmons stopped those purchases. This percentage is based upon all the assets of the KMPT, which totalled approximately $100 million in September 1982. The $100 million (actually $98 million) includes the $36 million in the KMPT Manager Account, $25 million in the Dedicated Bond Fund, and a receivable from Keystone Consolidated Industries of $37 million.

197. The Plaintiffs failed to show by a preponderance of the evidence that under the circumstances, Harold Simmons did not sufficiently diversify the KMPT's assets.

*October 1982 Decision Not to Tender Amalgamated Shares*

198. In an October 1, 1982 deposition conducted by the SEC, Harold Simmons testified that the decisions on the part of the pension funds that he advised as to whether to tender their shares would be made by an independent board. He explained that the independent board that would decide for the KMPT and KDIT would consist of members of the Board of Directors of Keystone who were outside of management.

199. At no time relevant herein was Harold Simmons' use of KMPT assets to purchase Amalgamated shares subjected to independent analysis.

200. Harold Simmons also testified on October 1, 1982, that if the self-tender offer were 100% successful, Amalgamated stock would cease to be traded on the securities exchanges, but that he did not expect that to happen. He testified that he expected "that there will be stock out there, that it will be traded over the counter ..." and that "a lot of shareholders won't tender at $65 a share...."

201. On October 1, 1982 Simmons believed that after the self-tender offer was completed there would still be between one and 1.2 million Amalgamated shares outstanding. In order for National to achieve its purpose of acquiring a controlling equity interest in Amalgamated, Harold Simmons needed to control 50% of the shares outstanding after the self-tender, plus one. Therefore, as of October 1, 1982, Harold Simmons believed that he needed to control 600,001 shares after the close of the self-tender. However, as of October 1, 1982, the Simmons Companies only owned 324,-700 shares. Therefore, Simmons believed that it was necessary for the KMPT and the other Trusts to retain their Amalgamated shares.

202. On October 4, 1982, at a meeting of the Corporate Committee, Harold Simmons, Alex Galbraith, and John Sommer voted unanimously not to tender the shares held by the KMPT and the KDIT. Sommer was present via speaker phone.

203. Harold Simmons notified Galbraith on Friday, October 1st, of the October 4th meeting. Galbraith was advised that the purpose of the meeting was to review the Amalgamated proposal and to decide whether or not the KMPT should tender its Amalgamated shares. At that time Simmons did not ask whether Galbraith wanted materials to review in preparation for the meeting nor did Galbraith ask for any.

204. Shortly after the Amalgamated Acquisition Agreement was signed, Galbraith received and reviewed a draft copy of the self-tender proposal. In preparation for the October 4th meeting, Galbraith reviewed the SKZ merger proposal, the National City Lines preliminary proxy statement and the Amalgamated self-tender offer.

205. The only materials Galbraith had with him at the meeting were his pencil and pad and the one page analysis supplied by Simmons. He had no copy of the Offer to Purchase in draft or final form. He does not recall Sommer asking what materials were available. Both Simmons and he mentioned to Sommer that they had the one page analysis which they described for Sommer in great detail.

206. Galbraith did not know what, if anything, Sommer had reviewed in preparation for the meeting. John Sommer did not receive, nor did he request any materials from anyone prior to the October 4, 1982 meeting for his use at the meeting.

207. John Sommer did not review or look at the Offer to Purchase, in draft or final form, on or prior to October 4, 1982.

208. John Sommer did not have discussions with anybody about the portfolios of the KMPT and the KDIT between April 22, 1982 and October 3, 1982. At all times relevant herein, Sommer was a fairly inactive member of the Corporate Committee, retired and spending most of his time in Florida.

209. When John Sommer voted on the question of whether the offer should be accepted or not, he made his decision based on Simmons' presentation made at the October 4th meeting.

210. Harold Simmons asked Galbraith to act as secretary of the October 4th meeting. Galbraith took sketchy pencil notes at the meeting and prepared the minutes of the meeting. After he prepared the minutes, Galbraith gave a copy to Simmons and Sommer. Galbraith never got any feedback from Simmons or Sommer about the minutes. No one ever told him that they were not accurate.

211. At the October 4th meeting, Harold Simmons stated that the KMPT currently held 184,900 shares of Amalgamated and the KDIT held 58,100 shares. Harold Simmons also stated that "National City Lines ("National") would stand ready to acquire the shares at some later date at $65.00 plus interest from the date of Amalgamated's offer, if the Committee thought such would be an appropriate alternative [to tendering]. Mr. Simmons noted that any such later sale might require an exemption from the Department of Labor."

212. Harold Simmons directed Kirkland & Ellis to prepare another set of minutes of the meeting. This second set of min-

utes, which was prepared from the first set, has material omissions, e.g., Harold Simmons' offer on behalf of National to purchase stock at a later date from the KMPT for $65, plus interest.

213. Harold Simmons, John Sommer and Alex Galbraith discussed the one-page financial analysis for the better part of an hour. This line-by-line review was the major part of the discussion. However, the one-page analysis reflects only the projected impact of a decision not to tender the shares of all the Trusts over which Simmons exercised investment authority. At the meeting Simmons and the others did not distinguish among the discrete needs of the Trusts.

214. There was no discussion at the meeting concerning any risks associated with the decision whether to tender the shares, despite the fact that there were substantial risks for the KMPT in continuing to hold its Amalgamated stock.

215. There was no discussion at the meeting that Amalgamated's policy to pay dividends might change as a result of the self-tender. There was no discussion of the possibility that the Amalgamated shares held by the KMPT might no longer meet the listing requirements of the New York Stock Exchange ("NYSE") and that those shares might be delisted from the NYSE. There was no discussion of the liquidity needs of the KMPT or the liquidity of the Amalgamated stock after the self-tender closed.

216. At the meeting there was no discussion or comparison of the benefits which would accrue to the KMPT had there been a decision to tender the shares.

217. There was no discussion at the meeting of the differing actuarial and investment needs of the KMPT (which holds assets of defined benefit plans) and the KDIT (which holds assets of defined contribution plans).

218. There was no discussion at the meeting that consumation of the self-tender would make Amalgamated a more risky investment.

219. At the October 4th meeting, Harold Simmons, John Sommer and Alex Galbraith failed to discuss anything but Harold Simmons' one-page economic analysis of the "upside" of not tendering the KMPT's and KDIT's Amalgamated shares.

220. Prior to the meeting, Harold Simmons had made up his mind that the Trusts' shares would not be tendered. He exercised virtually total control over the October 4th meeting.

221. From October 4th through November 10, 1982—the date the Offer to Purchase closed—the Corporate Committee never reviewed the decision not to tender.

222. At no time relevant on or after October 4th was the decision not to tender the KMPT's Amalgamated shares subjected to independent analysis.

223. Harold Simmons, as a fiduciary, represented the KMPT on its side of the Offer to Purchase. Harold Simmons, as Chairman of the Board, represented National on the other side of that transaction. From the transaction's conception to its consumation, Simmons represented National's interest, even going so far as to offer on behalf of National—during the October 4th meeting—to buy the KMPT shares at a later date.

224. Snetzer and Glenn Simmons knew of and concurred in the Corporate Committee's October 4th decision not to tender the shares. Snetzer knew that Harold Simmons held the meeting on October 4th—two days before the Offer was published—because "one of the requirements of the [Offer to Purchase] was to present pro forma financial statements giving effect to the transaction ... and Amalgamated had requested a determination [of] what the various trusts would do with regard to the tender offer." Snetzer knew that the early decision of the Corporate Committee facilitated and shaped the transaction.

225. Prior to the October 4th meeting, KCI, through Glenn Simmons (President and director of Keystone), Snetzer (an appointee of Keystone's Audit and Executive Committees) and Galbraith (chief financial

officer of Keystone), had both direct and indirect reason to believe that ERISA violations had occurred with regard to the KMPT.

226. The Corporate Committee's decision on October 4th not to tender the shares held by the KDIT and KMPT enabled National to fulfill the condition set by Mercantile in connection with providing the $12 million letter of credit, i.e., that National's financial obligation during the Offer would be limited to $12 million. The decision also meant that National did not have to provide an additional $19 million.

227. National's attainment of control of Amalgamated under the September 29 Acquisition Agreement was facilitated by the decision of Sommer, Galbraith and Harold Simmons not to tender the KMPT's shares of Amalgamated. This is true even if National had the resources to meet any financial obligation imposed by a tender of the KMPT's Amalgamated shares.

228. Harold Simmons' use of KMPT assets was an integral part of his efforts to defeat SKZ's attempt to take over Amalgamated and Simmons' own efforts to acquire control of Amalgamated.

229. On October 6, 1982, Amalgamated issued an Offer to Purchase for Cash which stated, *inter alia*, that it is "intended to result in ownership of the entire equity interest in [Amalgamated] by the Simmons Interests ... pursuant to the [September 29, 1982] Acquisition Agreement...." The Offer states that as of the date of the Offer, the Simmons Interests own an aggregate of 622,300 shares or about 30.7% of the then outstanding shares. Moreover, the Offer stated that Amalgamated "believes that it is not likely that any public market will exist for the shares after consumation of the Offer, and stockholders who do not tender their shares therefore risk becoming minority stockholders with illiquid investments in the company." Further, the Offer stated that depending upon the number of share tendered, "the shares may no longer meet the listing requirements of the NYSE and, therefore, may be delisted from the NYSE." Contrary to the

position of Amalgamated, National stated in the Offer that it believed there would be a "trading" market for the Amalgamated shares after the close of the Offer. However, the Offer also stated that National intends to cause Amalgamated to apply for termination of registration of its shares under the Securities Exchange Act, and, in that case, stockholders who remain will not be legally entitled to continue to receive information about matters required to be disclosed under the Securities Exchange Act.

230. The Offer also stated that "on October 4, 1982, the trustees or other persons exercising investment authority with respect to each of the TIME–DC Trust, Gibson Plan, Contran Retirement Trust, Contran Profit Sharing Trust, Keystone Pension Trust and Keystone Incentive Trust, respectively, determined to refrain from tendering, pursuant to the Offer, the shares held by such trusts. Such determinations were based in part on Harold C. Simmons' recommendation that the trusts not tender their shares...."

231. Neither the Corporate Committee nor any other fiduciary of the KMPT or KDIT applied for or otherwise received from the U.S. Department of Labor a prohibited transaction exemption with respect to the tendering of KMPT– or KDIT-owned Amalgamated shares pursuant to the October 6, 1982 Offer.

232. On October 4, 1982, Mercantile approved a $12 million letter of credit for National for the purpose of meeting National's obligation under the Acquisition Agreement. One of the conditions of approval was that an extension of credit to Contran for $15 million be reduced to $10 million and that the $15 million loan to National, approved on September 13, 1982, be revoked.

233. Mercantile also required collateral valued at almost $52 million as a condition to approving the $12 million letter of credit. Mercantile also required that Contran, the 1964 Simmons Trust and Harold Simmons each provide a written guarantee for the letter of credit.

*Events after October 4, 1982*

234. By letter dated October 8, 1982, Edward F. Sutkowski, as counsel to the Jefferson Bank, the trustee of the KDIT, notified the Department of Labor of "one or more possible violations of ERISA § 404(a) ... and § 406(a) ... and other possible violations in respect of transactions engaged in by Messrs. Harold C. Simmons, Alex M. Galbraith and John R. Sommer, members of the investment committee ("Committee") under the Keystone Consolidated Industries Master Deferred Incentive Trust Agreement dated May 1, 1977 ("Agreement") relative to The Amalgamated Sugar Company...." The letter went on to provide details concerning the purchases of Amalgamated shares for the KDIT and other entities associated with Harold Simmons.

235. By letter dated October 18, 1982 to Harold Simmons, the area administrator of the U.S. Department of Labor, Labor Management Services Administration, confirmed a conversation between Simmons and a Department of Labor investigator concerning an official investigation of the KMPT and KDIT pursuant to ERISA § 504.

236. Prior to October 28, 1982, both Alex Galbraith and Michael Snetzer were interviewed by a Department of Labor investigator in connection with Harold Simmons' use of KMPT assets to make Amalgamated stock purchases.

237. On October 28, 1982, the Keystone Board of Directors met. Glenn Simmons "advised that Counsel has recommended amendments to" the KMPT trust document. The Board unanimously adopted a resolution reappointing Harold Simmons, John Sommer and Alex Galbraith to the Corporate Committee. In addition, the Board of Directors amended the KMPT, retroactive to May 1, 1982, to grant the Corporate Committee authority to delegate its power to direct the purchase, sale or retention of securities or other properties to its Chairman—who was Harold Simmons—if the delegation was made in accordance with certain rules. The rules included that the delegation be in writing signed by all of the members of the Committee. Also, the delegation was to be effective only upon its delivery to the Trustee, which at that time was the Northern Trust Company. All the directors, including John Sommer, Harold Simmons, Glenn Simmons, and Michael Snetzer, voted to amend the KMPT trust document. This represented the first amendment of the Keystone Master Trust Agreement.

238. By an "Office Communication" dated October 28, 1982, Alex Galbraith, John Sommer and Harold Simmons, as members of the Corporate Committee, delegated in writing to Harold Simmons, the Chairman, the power to direct the retention or sale of any assets of the trust fund established under the KMPT Agreement and the KDIT Agreement, and to purchase securities or other property with any cash in such trust fund. The "Office Communication" also states that the Committee had reviewed all the acts of the Chairman taken since May 1, 1982, and the Committee ratified all actions taken by the Chairman with respect to the purchase, retention or sale of any assets of the trust fund since May 1, 1982. The written delegation was not made retroactive to May 1, 1982, was never delivered to the Trustee, and was not signed by Warren Reynolds. Reynolds had been a non-voting member of the Corporate Committee prior to October 28, 1982. He is not mentioned in the Minutes of the Board meeting of October 28. In some documents dated subsequent to October 28, 1982, however, he is still referred to as a non-voting member.

239. Galbraith testified that the Corporate Committee's review for purposes of ratification consisted of going "through the transaction reports we had from Jefferson and Northern and [reviewing] those actions. That would be purchases and sales." John Sommer recalls that all he did was sit in Galbraith's office and review the purchases and sales.

240. In and after September 1982, each of the Defendants had a conflict of interest between his or its role as a fiduciary and

Harold Simmons' use of the KMPT assets. The Defendants' ties to Harold Simmons' corporate interests and their involvement in the Amalgamated control contest gave them other interests which diverged from those of the beneficiaries.

241. On November 3, 1982, Glenn Simmons wrote the Northern Trust Company stating that although he was not a member of that Committee, he shared "the conclusion that Amalgamated Sugar stock purchases by the Pension Trust is an outstanding investment at $65 per share.... It is [his] opinion that the shares purchased by the Pension Plan were solely for the benefit of the plan participants."

242. At the time Glenn Simmons wrote the November 3, 1982 letter to the Northern Trust Company, he had done little more than review reports and confirm the fact that the stock purchases had been made. He did not question the Corporate Committee members about their reasons for retaining the shares or how much deliberation had gone into the October 4th decision.

243. In November 1982, shares of Amalgamated common stock were delisted from the New York Stock Exchange and ceased to be publicly traded.

244. At a special meeting of Amalgamated's Board of Directors held on November 12, 1982, all then current members of the Board resigned with the exception of Allan M. Lipman, Jr. and Quentin R. Smelzer, Jr. Harold Simmons, Glenn Simmons, Michael Snetzer and J. Walter Tucker, Jr. were appointed directors, and Harold Simmons was elected Chairman of the Board.

245. The following were the Amalgamated holdings of the Simmons' controlled entities as of November 10, 1982:

| | | |
|---|---|---|
| KMPT (184,900) | ............... | 28.3% |
| NLI (182,200) | ................. | 27.9% |
| NOA (104,500) | ................. | 16.0% |
| KDIT (58,100) | ................. | 8.9% |
| TIME–DC Trust (48,400) | ....... | 7.4% |
| Keycon (37,000) | ................ | 5.7% |
| Contran Trusts (5,000) | ......... | 0.8% |
| National (1,000) | ................ | 0.2% |
| Gibson Trust (200) | ............. | 0.03% |

246. The KMPT ultimately sold its Amalgamated stock in June 1984 at $80.50 per share. The decision to sell, and to sell at that price, was made by the Independent Fiduciary, Robert Torray. Under the Court-approved settlement orders in *Donovan v. Simmons*, Civil No. 83–1115, Mr. Torray was granted sole discretionary authority to decide whether to sell the KMPT's Amalgamated shares. The KMPT realized a total profit of approximately $3,744,563 on the Amalgamated shares it had purchased in 1982 at Harold Simmons' direction.

247. On January 26, 1983, the Keystone Board of Directors met and adopted a resolution authorizing the President to execute the documents and take whatever action was necessary under the terms of the Trusts to remove the Northern Trust Company as trustee of KMPT and Keystone Retirement Trust, and Jefferson Bank as Trustee of KDIT, and to appoint Harold Simmons and Alex Galbraith as co-trustees to serve as successor trustees. The Board adopted a resolution authorizing the President, *inter alia*, to convey deeds to five truck terminals, plus cash, to the pension trusts to satisfy the 1982 funding liability of Keystone. In February 1983, Galbraith and Harold Simmons did become the successor trustees of the KMPT and the Keystone Retirement Trust.

*Investments in National-Standard Company, Interpace Corporation, and Cyclops Corporation*

248. On December 27, 1982, Harold Simmons, Michael Snetzer, Glenn Simmons and Marlin Henning signed an original 13D with respect to stock issued by National-Standard Company ("National-Standard"). It was filed on behalf of: KMPT; KDIT; Keycon; Keystone; NLI; National; NOA; Dixie Rice Agricultural Corp,; Southwest Louisiana Land Company; Contran; TIME–DC Trust; Gibson Trust; Keystone Consolidated Retirement Savings Trust ("Keystone Retirement Trust"); Contran Profit Sharing Trust; and Harold Simmons, individually.

249. Harold Simmons began using KMPT assets to purchase National-Standard stock in late November 1982. The SEC Schedule 13D reported that, as of December 27, 1982, Keycon Insurance Ltd. and certain trusts over which Harold Simmons exercised investment authority owned 5.6% of the outstanding common stock of National-Standard. Between December 1982 and May 1983 Harold Simmons used about $4.5 million of KMPT assets to purchase 8.25% of all outstanding National-Standard shares. During this period the KMPT was the single largest shareholder of National-Standard stock among the interests over which Simmons exercised investment authority, which include his companies and certain trusts. Harold Simmons continued to use KMPT assets to purchase National-Standard stock even though the value of the KMPT's holdings in National-Standard suffered a 14% decline between late November 1982 and May 31, 1983.

250. During a three day period in January 1983 alone, Harold Simmons invested almost $3.5 million of KMPT assets in National-Standard stock. On February 10, 1983, Harold Simmons disclosed that interests controlled by him might acquire more stock and "may seek to have influence on National-Standard ...", including representation on the Board of Directors. According to the SEC Schedule 13D and amendments thereto, Glenn Simmons, Snetzer and Galbraith knew of these transactions at or about the time they occurred.

251. By February 3, 1983 Harold Simmons had become the sole trustee of the two retirement trusts for employees of Amalgamated ("the Amalgamated trusts") and he had begun to use the assets of those trusts to purchase National-Standard stock.

252. On February 7, 1983, a schedule 13D with respect to the securities of Interpace Corporation ("Interpace") was filed. A revised original 13D was filed on February 8, 1983. Both were signed by Harold Simmons and were filed on behalf of the KMPT, the KDIT, the Amalgamated Trusts, TIME–DC Trust and Harold Simmons individually. Harold Simmons reported in the SEC Schedule 13D that, as of February 7, 1983, certain trusts over which he exercised investment authority had purchased 5.23% of Interpace's outstanding common stock. As of April 1983, Harold Simmons had used $2.3 million of KMPT assets to purchase about 2.7% of all outstanding Interpace common stock; and the KMPT at that time was the single largest shareholder of Interpace stock among the trusts over which Harold Simmons exercised investment authority. None of the companies associated with Harold Simmons ever purchased Interpace stock.

253. On March 2, 1983, by letter on Contran stationery to the Chairman and Chief Executive of Interpace Corporation, Harold Simmons suggested that he be nominated to an opening on Interpace's Board of Directors "in view of the substantial amount of stock [he] represent[ed]."

254. On March 25, 1983, Harold Simmons entered into an agreement with National-Standard, which resulted in his becoming a member of its Board of Directors and a member of the Board's Nominating Committee. He agreed that neither he nor the Simmons Companies or Trusts associated with him would acquire voting shares in National-Standard representing more than 30% of the voting shares. The agreement was to expire on the later of April 1, 1985 or such time as Harold Simmons ceased to be a director of National-Standard.

255. A March 30, 1983 memorandum from Glenn Simmons to Harold Simmons, Michael Snetzer and Steven Watson, indicates that just before 5:00 p.m. Eastern Standard Time on March 29, 1983, J. Walter Tucker and Glenn Simmons placed a telephone call to Bill Knoell, President of Cyclops, but were unable to reach him or his secretary. Glenn Simmons called for Knoell again at 9:15 a.m. on March 30, and Knoell's secretary said she had just spoken with Knoell and that he referred the callers to Robert Kushner, Vice President, General Counsel and Secretary. Glenn Simmons told the secretary that they would rather

speak with Knoell and she said she would try to reach him and call them back. Thirty minutes later, Glenn Simmons called again. This time Glenn Simmons actually spoke to Kushner and "advised" Kushner of the following:

—that they were making a courtesy telephone call to Knoell to advise him that "affiliates" of Keystone would be filing an SEC Schedule 13D "in the next few days" announcing purchases of about 5.25% of Cyclops stock;

—that "[their] investment manager" usually invests in companies that are considered under-valued at the time of investment, especially where [they] see a potential increase in stock values or earnings;

—that [they] usually buy in significant quantities and that [they] have no plans at the present time to buy any more stock, or not to buy any more stock;

—and that investment decisions will be made periodically concerning all the investment portfolio, including Cyclops.

256. On March 30, 1983, Glenn Simmons also informed Kushner that "[they] considered Cyclops to be a well-managed company, capable of increasing market shares and profits, and a good investment for future appreciation." Kushner asked Glenn Simmons who owned the stock, and Glenn Simmons "advised him that there were 8 different purchasers, including pension trusts, of slightly over 180,000 [Cyclops] shares." Glenn Simmons reported to Harold Simmons and Michael Snetzer that "Tuck and I feel that [the Cyclops representatives] were probably aware of the [Simmons' interests' Cyclops] purchases, reacted with a cool attitude and will probably be negative on future purchases...."

257. Attached to Glenn Simmons' March 30, 1983 memorandum is a one page document marked "File", with headings "Reasons for Buying Cyclops Stock" and "Possible Questions." The information under the first heading reflects the information that was provided by Glenn Simmons to Kushner in their March 30th telephone conversation. The "Possible Questions" were:

1. Are you planning on buying any more? Answer above.

2. Are you looking toward a position in management? Have not considered it, if you would like to discuss the matter, we are amenable to talking about it.

3. Tell me about National Standard. Article in the Wall Street Journal yesterday covered the matter.

258. On April 4, 1983, an original schedule 13D with respect to the securities of Cyclops Corporation ("Cyclops") signed by Harold Simmons, was filed on behalf of the KMPT, KDIT, TIME–DC Trust, the Amalgamated Trusts, the Contran Trusts, Gibson Trust and Harold Simmons, individually ("the reporting persons"). Harold Simmons reported in the SEC Schedule 13D that, as of April 4, 1983, certain trusts over which he exercised investment authority had purchased 5.29% of Cyclops' outstanding common stock. As of April 1983, Harold Simmons had used almost $3.7 million of KMPT assets to purchase 4.24% of Cyclops' outstanding common stock, and the KMPT at that time was the single largest shareholder of Cyclops stock among the trusts over which Simmons exercised investment authority.

259. None of the companies associated with Harold Simmons ever invested in Cyclops stock.

260. On April 5, 1983, Interpace announced that it had received an offer from a group, which included First Boston Corporation and certain members of Interpace's senior management, to acquire all outstanding shares of Interpace at $30 per share in cash and all outstanding shares of Interpace's five percent cumulative convertible preferred stock at $118.125 in cash.

261. On April 6, 1983, Harold Simmons advised Interpace's investment banker by letter that "companies" with which he was affiliated were interested in considering an offer of $33.00 per share for all of the outstanding stock of Interpace. In that letter, Simmons proposed that the group formed by First Boston Corporation pur-

chase all of the net balance sheet assets of Interpace for an equivalent of $30.00 in cash per common stock and $118.00 in cash per preferred share, and that it assume all of Interpace's balance sheet liabilities. He also proposed that upon closing of that transaction, all employees of Interpace would be terminated and immediately reemployed by that group and all Interpace board members would resign and elect nominees suggested by Harold Simmons. Harold Simmons further proposed that simultaneously with the closing of the purchase of Interpace's assets by the group formed by First Boston Corporation, Interpace would be combined with a "corporation" affiliated with Harold Simmons pursuant to which all holders of the Interpace common stock would receive $33.00 in cash and all holders of Interpace's preferred stock would receive $130.00 in cash per share. Pursuant to this proposal, Interpace—as a shell under the control of Harold Simmons—would manage and be responsible for Interpace's pension plans.

262. By letter dated April 8, 1983, Harold Simmons was advised that the group formed by First Boston Corporation to acquire Interpace had no interest in his proposal of April 6, 1983.

263. On April 8, 1983 Harold Simmons advised Interpace's investment banker that he wished to review information regarding the sources of financing available to the First Boston Group. He further advised Interpace's investment banker that, upon a review of such information, he might determine to make an offer for Interpace at a price higher than that offered by the First Boston Group.

264. On April 14, 1983 Cyclops sued, *inter alia,* Harold Simmons, the KMPT, the KDIT, Michael Snetzer, Alex Galbraith, Glenn Simmons, and John Sommer. In Amendment No. 4 to the Cyclops 13D, Harold Simmons stated that on April 29, 1983, he, Glenn Simmons and Michael Snetzer met with the President and Chief Executive

Officer of Cyclops and a Director of Cyclops, at which meeting the Cyclops representatives expressed willingness to dismiss their lawsuit if the reporting persons would sell their shares to Cyclops for $31 per share. Harold Simmons stated that they would be willing to sell at $40 per share, but the Cyclops representatives indicated that was an excessive price, and he felt that the reporting persons should weigh the possibility of making an offer for all the shares. The parties discussed other means for resolving the dispute, but no agreement was reached. By May 9, 1983, Simmons announced that he had decided not to make an offer to purchase all shares of Cyclops.

265. On April 28, 1983, the Keystone Board of Directors met. Alex Galbraith requested Board approval of two resolutions authorizing investment by the KMPT and KDIT in the Contran Corporation Combined Investment Trust. The Board adopted a resolution amending the KMPT Agreement to provide that the trustee would, at the discretion of the Corporate Committee, invest all or any portion of the KMPT, as determined by the Corporate Committee, in the Combined Investment Trust established and maintained by Contran. The Board further adopted a resolution that the Combined Investment Trust was adopted to fund the plans, and that the trustees be directed to invest the assets of the KMPT to the extent so directed by the Corporate Committee. The same resolutions were adopted for the KDIT.

266. In January 1983, Mercantile replaced the Northern Trust Company as custodian for the KMPT assets held by the Northern Trust. Mercantile established a "Managed Account" [1] for the KMPT. The assets of Northern Trust Manager Account were transferred into Mercantile's Managed Account. This Managed Account reflects transactions involving the KMPT assets managed by Harold Simmons.

---

1. The KMPT "Manager" Accounts and the KMPT "Managed" Accounts are the same. During the relevant time period, two different custodians held the funds and used different terminology in referring to them.

267. As of April 30, 1983, Harold Simmons had invested a total of $3,673,731.50 on behalf of the KMPT in Cyclops stock. The KMPT thereafter bought no additional Cyclops stock. The Cyclops investment represented less than 11 percent of the KMPT's assets in the Managed Accounts, which did not include all of the assets of the KMPT.

268. The Plaintiffs failed to show by a preponderance of the evidence that Harold Simmons did not maintain diversification of the KMPT's assets when he directed the purchases of Cyclops stock.

269. As of June 30, 1983, Harold Simmons had invested a total of $4,835,980.50 in National-Standard stock. The KMPT thereafter bought no additional National-Standard stock. The National-Standard investment represented less than 14 percent of the KMPT's assets in the Managed Accounts, which did not include all of the assets of the KMPT.

270. The Plaintiffs failed to show by a preponderance of the evidence that Harold Simmons did not maintain diversification of the KMPT's assets when he directed the purchases of National-Standard stock.

271. As of April 30, 1983, Harold Simmons had invested a total of $2,316,576.00 on behalf of the KMPT in Interpace stock. The KMPT thereafter bought no additional Interpace stock. The Interpace investment represented less than 7 percent of the KMPT's assets in the Managed Account, which did not include all of the assets of the KMPT.

272. The Plaintiffs failed to show by a preponderance of the evidence that Harold Simmons did not maintain diversification of the KMPT's assets when he directed the purchases of Interpace stock.

273. On April 26, 1983 the Jefferson Bank sued Harold Simmons and others. On May 13, 1983 the preliminary injunction was entered in that case.

274. On May 9, 1983, Raymond Donovan, Secretary of Labor, filed a complaint in *Donovan v. Simmons, et al.* On May 10, 1983 the Department of Labor and the defendants in *Donovan v. Simmons* stipulated to an order which effectively prohibited further purchases by the pension Trusts associated with Harold Simmons of the stock of National-Standard, Interpace, and Cyclops.

275. Harold Simmons had analyzed the values of Cyclops Corporation, National-Standard Company, and Interpace Corporation. He believed that each of those stocks had an intrinsic value significantly exceeding their public trading prices.

276. Harold Simmons' economic analyses of those stocks proved to be correct. Both the Cyclops stock and the Interpace stock were sold by the KMPT at substantial profits. The KMPT continues to hold its National-Standard stock, which has a market value higher than the Trust's purchase price.

277. Harold Simmons' use of KMPT assets to purchase shares of National-Standard coincided with efforts to gain control of National-Standard and was a factor in his subsequent acquisition of a seat on the Board of Directors.

278. With regard to the agreement made by Harold Simmons with National-Standard to limit purchases by himself and the Simmons Companies and Trusts to 30% of the voting shares of National-Standard, the interests of the corporations and trusts were not necessarily congruent. The possibility of conflict dictated the desirability of an independent investigation of options to insure that the actions taken were in the best interests of the plan fiduciaries, but there is no evidence that any such investigation was undertaken.

279. At all times relevant herein, Glenn Simmons and Michael Snetzer knew that Harold Simmons has frequently engaged in a practice of seeking to take control of companies through stock purchases or other means. They also knew that Harold Simmons involves himself, his companies and certain trusts over which he exercises investment authority in contests for control of target corporations.

280. Glenn Simmons and Snetzer knew or should have known that Harold Simmons used KMPT assets to assist Harold Simmons in his contest for control of National-Standard.

281. Glenn Simmons and Snetzer knew or should have known that Harold Simmons' use of KMPT assets to purchase shares of National-Standard was an integral part of Simmons' efforts to gain control of that company and to gain a seat on the National-Standard Board of Directors.

282. Glenn Simmons and Snetzer knew or should have known that Harold Simmons, personally and on behalf of his corporate interests, had a conflict of interest relating to his use of KMPT assets to invest in National-Standard.

283. At no time did Glenn Simmons or Snetzer raise questions about or otherwise monitor Harold Simmons' uses of KMPT assets to purchase stock of National-Standard.

284. Glenn Simmons and Snetzer knew or should have known that Harold Simmons' use of KMPT assets after October 28, 1982 to purchase stock of National-Standard was not in conformity with the KMPT trust document because Harold Simmons was acting pursuant to an improper delegation of investment responsibility from the Corporate Committee on October 28, 1982. Each of these Defendants failed to take any steps to protest, inhibit or prevent each such unlawful use of KMPT assets.

285. Plaintiffs have offered insufficient evidence to satisfy their burden of proof with respect to their allegations that Alex Galbraith, John Sommer and KCI violated any provision of ERISA with respect to the transactions involving National-Standard, Interpace and Cyclops.

286. Plaintiffs have offered insufficient evidence to satisfy their burden of proof with respect to their allegations that Harold Simmons, Glenn Simmons and Michael Snetzer violated any provision of ERISA with respect to the transactions involving Interpace and Cyclops.

*The Defendants' Motivations*

287. None of the Defendants' activities or decisions involved in this suit were willful violations of the law.

288. None of the activities of the Defendants which have been challenged in this case were intended to injure the KMPT.

289. Harold Simmons is a brilliant, self-made man. He has been unusually successful and his rise in the financial community is something of which legends are made.

290. Because of his unusual success, Harold Simmons believes that what is good for him is good for everyone else. He acts as a kind of "benevolent dictator" of the companies and trusts over which he exercises investment authority.

291. There are no indications that Harold Simmons ever acted to harm any of the trusts over which he exercises investment authority. He made investment decisions for the KMPT based on the exercise of his best business judgment. That judgment involved himself and all of the companies and pension plans with which he was involved. In this scenario, it is impossible to conclude that the decisions he made were solely in the interests of the participants of the plans; it was, in fact, impossible for Harold Simmons to avoid dealing in his own interests.

292. The result of Harold Simmons' decisions regarding the KMPT is that the plans have done well. But, with respect to all claims, that is not the test for determining if violations of ERISA have occurred.

*Loss, Risk of Loss, and Profit*

293. Plaintiffs have failed to prove that the investment activities undertaken by Harold Simmons for the KMPT prior to September 1982 caused:

(a) any loss to the KMPT, or

(b) any risk of loss to the KMPT, or

(c) any profit or benefit to Harold Simmons, or

(d) any profit or benefit to the companies affiliated with Harold Simmons.

294. Plaintiffs have failed to prove that the KMPT's September 1982 purchases of Amalgamated stock caused any loss to the KMPT. Plaintiffs have shown that the KMPT's September 1982 purchases of Amalgamated stock caused:

(a) a risk of loss to the KMPT, and

(b) profit or benefit to Harold Simmons, and

(c) profit or benefit to the companies affiliated with Harold Simmons.

295. Plaintiffs have failed to prove that the activities and decisions concerning the October 1982 Amalgamated self-tender offer caused any loss to the KMPT. Plaintiffs have shown that the activities and decisions concerning the October 1982 Amalgamated self-tender offer caused:

(a) a risk of loss to the KMPT, and

(b) profit or benefit to Harold Simmons, and

(c) profit or benefit to the companies affiliated with Harold Simmons.

296. Plaintiffs have failed to prove that the investment of the KMPT's assets in the securities of National-Standard Company caused:

(a) any loss to the KMPT, or

(b) any risk of loss to the KMPT.

297. Plaintiffs have shown that the investment of the KMPT's assets in the securities of National-Standard Company caused:

(a) profit or benefit to Harold Simmons, and

(b) profit or benefit to the companies affiliated with Harold Simmons.

*Claims Which Were Disallowed*

■ 298. Plaintiffs' claims against Glenn Simmons for violation of 29 U.S.C. § 1105(a)(2) were not pleaded prior to trial.

299. Plaintiffs first asserted their claim that Glenn Simmons violated 29 U.S.C. § 1105(a)(2) during trial.

300. Prior to Plaintiffs' attempt to amend their complaint during trial, Glenn Simmons was not aware of Plaintiffs' intent to seek liability against Glenn Simmons for violations of 29 U.S.C. § 1105(a)(2).

301. Plaintiffs' claims that Glenn Simmons violated 29 U.S.C. § 1105(a)(2) were not tried by consent.

302. Plaintiffs' amended pleadings alleging violations of 29 U.S.C. § 1105(a)(2) by Glenn Simmons were not timely filed and the allowance of such amendments would have prejudiced Glenn Simmons in maintaining his defense as to those allegations. Accordingly, at trial, the Court disallowed that amendment pursuant to Rule 15(b) of the Federal Rules of Civil Procedure.

303. At the close of Plaintiffs' case, the Court, in granting Defendants' Motion for Dismissal pursuant to Federal Rule of Civil Procedure 41(b) as to the ERISA § 404(a)(1)(C) claim, held that Plaintiffs had not proved by a preponderance of the evidence that, under the circumstances, Harold Simmons did not sufficiently diversify the KMPT's assets.

■ 304. At the close of Plaintiffs' case, the Court, in granting Defendants' Motion for Dismissal pursuant to Federal Rules of Civil Procedure 41(b) as to the ERISA § 405(c) claim, held that § 405(c) does not create a basis for liability against Defendants.

305. Plaintiffs' purported claim under ERISA § 405(c) is not a bona fide issue in this suit. The individual Defendants have never asserted in this litigation that they relied on ERISA section 405(c) as a means of limiting or escaping any liability they might otherwise face for breach of fiduciary obligations under ERISA.

## CONCLUSIONS OF LAW

■ 1. As Chairman of the Corporate Committee and as a member of the Keystone Board of Directors, Harold Simmons is a fiduciary with respect to both the KMPT and the Pension Plan. See, ERISA § 3(21).

■ 2. As a member of the Corporate Committee and as a member of the Key-

stone Board of Directors, John Sommer is a fiduciary with respect to both the KMPT and the Pension Plan. *Id.*

■ 3. As a member of the Corporate Committee, Alex Galbraith is a fiduciary with respect to both the KMPT and the Pension Plan. *Id.*

4. "ERISA ties fiduciary responsibilities to a person's actual authority.... The key language in the statutory definition [29 U.S.C. § 1002(21)(A) ] is that a person is a fiduciary 'to the extent' he or she exercises control or authority over the plan." *Leigh, Dusek, Johnson v. Engle,* 727 F.2d 113 at 133 (7th Cir.1984).

■ 5. As members of the Keystone Board of Directors, Michael Snetzer and Glenn Simmons are fiduciaries with respect to both the KMPT and the Pension Plan. *Id.* They were fiduciaries with respect to the selection and retention of the plan administrators. *Leigh,* 727 F.2d at 133, 134. Their fiduciary duties extended to the KMPT's investments in Amalgamated. A determination of the scope of Snetzer's and Glenn Simmons' fiduciary duties cannot rest on whether they exercised direct control over the investments. *Leigh,* 727 F.2d at 134. As in *Leigh:*

"As the fiduciaries responsible for selecting and retaining their close business associates as plan administrators, [Snetzer and Glenn Simmons] had a duty to monitor appropriately the administrators' actions.

   \*    \*    \*    \*    \*    \*

[Snetzer and Glenn Simmons] were obliged to act with an appropriate prudence and reasonableness in overseeing [Harold Simmons'] management of the [KMPT]." 727 F.2d at 135 (citations omitted).

Snetzer and Glenn Simmons were aware of the KMPT's investments in Amalgamated and were participants in Harold Simmons' efforts to block the SKZ merger and his efforts to acquire control of Amalgamated. They knew that Harold Simmons faced conflicting loyalties with respect to those investments. They themselves had substantial interests in the outcome of the Harold Simmons' control efforts. They had duties of surveillance and oversight stemming from their power to select and retain plan administrators. See *Leigh,* 727 F.2d at 135, 134–35 n. 33.

■ 6. Similarly, Keystone, by virtue of its power to appoint and retain and its duty to monitor the Corporate Committee, is a fiduciary with respect to the KMPT and the Pension Plan. *Id. Leigh,* 727 F.2d at 133–35.

■ 7. In evaluating a motion for involuntary dismissal at the close of Plaintiffs' case under Rule 41(b) of the Federal Rules of Civil Procedure, the Court is "bound to take an unbiased view of all of the evidence, direct and circumstantial, and accord it such weight as (the court) believe(s) it is entitled to receive." *Patterson v. General Motors Corp.,* 631 F.2d 476, 487 (7th Cir.1980), quoting *Allred v. Sasser,* 170 F.2d 233, 235 (7th Cir.1948). Thus, to avoid dismissal, the Plaintiffs must have proven their case by a preponderance of the evidence.

■ 8. ERISA § 404(a)(1)(C) requires that a fiduciary "diversify the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so...." Congress made clear that the "degree of investment concentration that would violate [the diversification requirement] cannot be stated as a fixed percentage." House Conference Report No. 93–1280, *1974 U.S. Code Cong. & Admin.News* (Vol. 3) 4639 at 5084; see 29 C.F.R. sec. 2550.-404a–1(b)(2)(ii)(B).

9. ERISA measures diversification by considering the assets of the trust as a whole, not by the assets of particular funds. Accordingly, the diversification of Harold Simmons' investments on behalf of the KMPT must be evaluated by considering all the assets of that Trust. See House Conference Report No. 93–1280, 1974 U.S. Code Cong. & Admin.News (Vol. 3) at 5085.

10. Plaintiffs have not proved by a preponderance of the evidence that, under the circumstances, Harold Simmons did not sufficiently diversify the KMPT's assets.

11. ERISA § 405(c), 29 U.S.C. § 1105(c), provides a limitation of liability. It addresses the situation in which, consistent with the trust instrument, the named fiduciaries allocate fiduciary responsibilities among themselves or designate persons other than named fiduciaries to carry out fiduciary responsibilities. If such a delegation occurs, section 405(c) provides that the delegator will not be liable for the acts or omissions of the delegatee, except in respect to certain enumerated violations of ERISA secs. 404(a)(1) and 405(a).

12. Plaintiffs have shown a risk of loss to the KMPT but have failed to prove the existence of any actual loss to the KMPT from any of the alleged violations of ERISA.

13. Plaintiffs are not required to show that the KMPT suffered an actual loss as a result of alleged violations of ERISA.

"ERISA clearly contemplates actions against fiduciaries who profit by using trust assets, even where the plan beneficiaries do not suffer direct financial loss." *Leigh v. Engle*, 727 F.2d 113, 122 (7th Cir.1984).

14. As in *Leigh:*

"(t)he nature of the breach of fiduciary duty alleged here is not the *loss* of plan assets but instead the *risking* of the trust's assets at least in part to aid the defendants in their acquisition program." 727 F.2d at 122.

15. Plaintiffs have shown profit or benefit to Harold Simmons and his affiliated companies from the alleged violations of ERISA and, thereby, have proved the fact of damage required by § 409 of ERISA, 29 U.S.C. § 1109, for liability thereunder.

16. Good faith is not a defense to a fiduciary's breach of the duty of loyalty imposed by ERISA. *Leigh,* 727 F.2d at 124.

17. The activities undertaken by the Defendants with respect to the KMPT prior to September 1982 did not violate any of the following provisions of ERISA: 29 U.S.C. §§ 1104(a)(1)(A); 1104(a)(1)(B); 1104(a)(1)(D); 1105(a)(2); 1106(a)(1)(D); 1106(b)(1); 1106(b)(2).

18. In and after September 1982 each of the Defendants had a conflict of interest between his or its interest as a fiduciary and the interests of the beneficiaries.

19. Under the section 404(a) duty of loyalty:

"(w)here the potential for conflicts is substantial, it may be virtually impossible for fiduciaries to discharge their duties with an 'eye single' to the interests of the beneficiaries, and the fiduciaries may need to step aside, at least temporarily, from the management of assets where they face potentially conflicting interests."

*Leigh,* 727 F.2d at 125. Here, none of the Defendants ever stepped aside.

20. "Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries."

*Leigh,* 727 F.2d at 125–26; citing *Donovan v. Bierwirth,* 538 F.Supp. 463, 470 (E.D.N.Y.1981), aff'd as modified, 680 F.2d 263, 272 (2nd Cir.); cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). No such independent investigation was conducted here by any of the Defendants.

21. Whether "the trust's use of its assets at all relevant times tracked the best interests of the (Defendants) in the control contest," *Leigh,* 727 F.2d at 126, may also be considered by this Court in assessing a claim under § 404(a). "(T)he extent and duration of these actions congruent with the interests of another party are also rele-

vant...." *Leigh,* 727 F.2d at 126. Here, the trusts began making heavy purchases of Amalgamated stock when Harold Simmons and his corporate interests decided to oppose the proposed merger and wage a proxy contest. The trusts ceased purchasing Amalgamated stock when Harold Simmons decided to make a leveraged buy-out proposal for Amalgamated. Harold Simmons thereafter recommended and voted not to tender the KMPT's Amalgamated shares and that decision was published in the Offer to Purchase for Cash.

■ 22. Harold Simmons' use of the KMPT's assets to purchase shares of Amalgamated in September 1982 and his five-day stock sale to generate the cash to purchase those shares were not for the "exclusive benefit" or "solely in the interests of the participants," *see,* ERISA §§ 404(a)(1) and 404(a)(1)(A), because these actions were taken to benefit, at least in part, Harold Simmons and his corporate interests.

■ 23. Harold Simmons' liquidation of the KMPT's stock portfolio to buy almost $10 million of Amalgamated shares without any new, in-depth examination as to further investment in Amalgamated and without any effort to seek an independent analysis fails to satisfy the prudent person test required by ERISA § 404(a)(1)(B).

24. "(T)he protective provisions of section 406(a)(1)(D) and (b)(1) should be read broadly in light of Congress' concern with the welfare of the plan beneficiaries.

     *     *     *     *     *     *

The entire statutory scheme of ERISA demonstrates Congress' overriding concern with the protection of plan beneficiaries...." *Leigh,* 727 F.2d at 126.

25. "Section 406(a)(1)(D) should be read to cover the actions of a trustee who buys shares in a target corporation in order to assist either the target's management *or the raider in its quest for corporate control or a 'control*

*premium'."* (Emphasis supplied). *Leigh,* 727 F.2d at 126.

■ 26. Section 406(b)(1) requires that a trustee not deal with the assets of a plan "in his own interest." The term "interest" should be read broadly to include interests, both financial or nonfinancial, other than direct financial interests. See *Leigh,* 727 F.2d at 127.

■ 27. Harold Simmons, Keystone and National City Lines, Inc. are parties in interest with respect to the Pension Plan and KMPT. *See,* ERISA § 3(14).

28. Harold Simmons used KMPT assets to purchase Amalgamated shares and in doing so, he benefitted himself and his corporate interests, in violation of both ERISA sections 406(a)(1)(D) and 406(b)(1).

29. Regardless of his intent, Harold Simmons used KMPT assets in an effort to defeat SKZ's attempt to take over Amalgamated and to assure his own take over of Amalgamated, and in doing so, he benefitted himself and his corporate interests. *See,* ERISA §§ 406(a)(1)(D) and 406(b)(1).

■ 30. The Amalgamated self-tender offer, which provides that certain stockholders of Amalgamated—e.g., the KMPT—would have the opportunity to be paid $65 per share by National is a "transaction" within the meaning of ERISA § 406.

■ 31. Harold Simmons, Glenn Simmons and Michael Snetzer violated ERISA § 406(b)(2) by acting on behalf of National in a transaction involving the KMPT where the interests of National were adverse to those of the KMPT.

■ 32. The term "adverse" does not require that the interests be antithetical, but only that they are different. Concerning the purpose and meaning of ERISA § 406(b)(2), and the breadth of the section's coverage, ERISA's drafters stated:

"... [T]he labor provisions (but not the tax provisions) prohibit a fiduciary from acting in any transaction involving the plan on behalf of a person (or representing a party) whose interests are adverse

to the interests of the plan or of its participants or beneficiaries. This prevents a fiduciary from being put in a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries." [2]

33. Harold Simmons was not acting solely in the interests of the KMPT participants and beneficiaries nor for the exclusive purpose of providing benefits to the participants when, on October 4th, he recommended and voted that the KMPT not tender its Amalgamated shares. *See*, ERISA §§ 404(a)(1) and 404(a)(1)(A).

34. Harold Simmons' recommendation and vote not to tender the KMPT's Amalgamated shares benefitted his own interests and those of his companies in violation of ERISA §§ 406(a)(1)(D). And because Harold Simmons dealt with the assets of the KMPT in his own interests, he violated ERISA § 406(b)(1).

■ 35. The Corporate Committee's October 4th decision not to tender and the publication of that decision in the Offer to Purchase were done at least in part in order to benefit Harold Simmons and his corporate interests and therefore were not done solely in the interest of the KMPT participants and beneficiaries. *See*, ERISA §§ 404(a)(1), 406(b)(1).

■ 36. The Corporate Committee's failure to discuss anything but the "upside" of not tendering the KMPT's Amalgamated shares marks a failure of the elements of conduct necessary to ensure prudent, independent and scrupulous review. *See*, ERISA § 404(a)(1)(B).

37. If Harold Simmons, Sommer and Galbraith had chosen to tender one single share of the KMPT's Amalgamated shares, the tender would have resulted in a direct or indirect exchange of $65 between National and the KMPT, thereby violating ERISA § 406(a)(1)(A). Any party in interest— e.g., National—which engages in a prohibited transaction with an employee benefit plan—such as the KMPT—is subject to a tax of 5% of the amount involved in the transaction. If the prohibited transaction is not corrected within a specific period of time, then the party in interest is assessed an additional 100% tax on the amount involved. A decision to tender the KMPT's shares would have resulted in a multimillion dollar tax on National. Thus, considering the massive financial impact on National, there was no freedom of choice when the three Corporate Committee members decided not to tender the KMPT's Amalgamated shares.

■ 38. Any use of Keystone assets to finance National's obligation under the Acquisition Agreement to purchase KMPT's Amalgamated shares would have violated the proscriptions of ERISA §§ 406(a)(1)(A) and 406(a)(1)(D), because Keystone is a party in interest with respect to the KMPT.

■ 39. Harold Simmons' offer at the October 4th meeting to have National acquire the KMPT's Amalgamated shares at some later date at $65 per share, plus interest, was for the benefit of himself and his corporate interests in violation of ERISA §§ 404(a)(1), 404(a)(1)(A), 406(a)(1)(D), 406(b)(1) and 406(b)(2).

■ 40. Alex Galbraith, John Sommer, Michael Snetzer, Glenn Simmons and Keystone were fiduciaries who faced conflicting loyalties—on the one hand, to Harold Simmons' corporate interest, represented by Keystone and National, and on the other hand, to the interests of the KMPT's beneficiaries. They should have realized that their ties to the Simmons interests and their interest in the Amalgamated control contest cast serious doubt on their ability to act solely in the interests of the beneficiaries. Yet, during September and October 1982 these fiduciaries undertook no independent investigation of the KMPT's investment options. Nor did they seek independent counsel regarding how Harold Simmons' use of KMPT assets affected the

---

**2.** Joint Explanatory Statement of the Committee on Conference, House Conference Report No. 1280, 93d Cong., 2d Sess., *reprinted in,* 1974 *U.S.Code Cong. & Ad.News* 5038, 5089.

interests of the beneficiaries. As a result, they violated their fiduciary duties under ERISA §§ 404(a)(1)(A) and 404(a)(1)(B).

41. In disregarding the obvious fact that Harold Simmons' purchases of Amalgamated for the KMPT were benefitting Simmons and his corporate interests, Snetzer, Keystone, Glenn Simmons, Galbraith and Sommer breached their duties of loyalty and prudence under ERISA §§ 404(a)(1)(A) and 404(a)(1)(B).

██ 42. By violating ERISA § 404(a)(1), Alex Galbraith, John Sommer, Michael Snetzer and Keystone allowed Harold Simmons to breach his fiduciary duties. Therefore, under ERISA § 405(a)(2), Galbraith, Sommer, Snetzer and Keystone are liable for Harold Simmons' breaches.

43. Concerning what a fiduciary "should know" with respect to ERISA § 406(a), the final Conference Committee Report states:

> "Under the labor provisions a fiduciary will be liable for losses to a plan from a prohibited transaction in which he engaged if he would have known the transaction involving the particular party-in-interest was prohibited if he had acted as a prudent man. The type of investigation that will be needed to satisfy the test of prudence will depend upon the particular facts and circumstances of the case. In the case of a significant transaction, generally for a fiduciary to be prudent he must make a thorough investigation of the other party's relationship to the plan to determine if he is party-in-interest." [3]

██ 44. Alex Galbraith, John Sommer, Michael Snetzer, and Glenn Simmons violated ERISA § 406(a)(1)(D) because they knew or should have known that Harold Simmons used the KMPT assets to purchase Amalgamated shares so as to benefit himself and National, parties in interest.

45. Galbraith, Sommer, Snetzer and Glenn Simmons violated ERISA

§ 406(a)(1)(D) because they knew or should have known that the October 4th decision of the Corporate Committee not to tender was a use of KMPT assets for the benefit of a party in interest, e.g., Harold Simmons and National.

██ 46. Keystone should have more stringently monitored the performance of the Corporate Committee after Harold Simmons took over investment management responsibilities, particularly after the Jefferson Bank raised concerns regarding possible ERISA violations.

██ 47. Snetzer's and Keystone's failure to monitor and investigate in September and October 1982 enabled Harold Simmons, Alex Galbraith and John Sommer to commit fiduciary breaches. Thus, Snetzer and Keystone have co-fiduciary liability under ERISA § 405(a)(2) for those breaches.

██ 48. Given their corporate positions with National, Snetzer and Glenn Simmons knew that the decision not to tender aided National in its effort to achieve equity control of Amalgamated and saved National the cost of borrowing at least an additional $12 million if only the KMPT had tendered its shares. Thus, Snetzer and Glenn Simmons used KMPT assets for the benefit of National, a party in interest, in violation of § 406(a)(1)(D).

██ 49. Keystone's power to appoint the members of the Corporate Committee carries with it the duty and responsibility to monitor the performance of its appointees.

██ 50. If, as Keystone asserts, it can have no knowledge of wrongdoing imputed to it through the Corporate Committee, but it nonetheless admits that it has an obligation to monitor the Committee's activities, then Keystone must create some means to monitor the Committee's activities which does not depend upon knowledge imputed through the Committee's members. But, Keystone took no such steps to

---

**3.** Joint Explanatory Statement of the Committee of Conference, House Conference Report No. 1280, 93d Cong., 2d Sess., *reprinted in,* 1974

*U.S.Code Cong. & Ad.News* 5038, 3087. *See, Herman v. Painting Industry Insurane Fund,* No. 77 Civ. 1490, slip op. at 3 (S.D.N.Y.1981).

satisfy its obligation to monitor, and thus Keystone violated its duties of prudence and loyalty under ERISA § 404(a)(1)(A) and 404(a)(1)(B).

51. Keystone, Glenn Simmons and Snetzer in September and October 1982 had an obligation to take prudent and reasonable action to determine whether the Corporate Committee members were fulfilling their fiduciary obligations. Their neglect of this obligation violated the duties of loyalty, diligence and prudence imposed by ERISA §§ 404(a)(1)(A) and 404(a)(1)(B).

52. Keystone's failure to comply with ERISA § 404(a)(1) resulted in Keystone's reappointing Harold Simmons, Sommer and Galbraith to the Corporate Committee on October 28, 1982, thus permitting those Committee members to continue committing ERISA violations. Consequently, through its own ERISA violations, Keystone is liable under ERISA § 405(a)(2) for the co-fiduciary violations of Harold Simmons, Sommer and Galbraith.

53. Defendants' failure to consult with outside, independent counsel with respect to Harold Simmons' use of KMPT assets exemplifies their lack of prudent conduct. *See*, ERISA § 404(a)(1)(B).

54. Harold Simmons' own estimation of the value of the Amalgamated shares in September and October is not relevant to a finding of whether he acted in compliance with plan documents or whether he engaged in prohibited transactions. That estimation is not determinative to a finding of whether he acted solely in the interest of the KMPT participants and beneficiaries, exclusively for the purpose of providing benefits, or with prudence.

55. That the transactions in which Harold Simmon engaged ultimately "paid off well" for the trusts "is no defense in this action for breach of fiduciary duties." *Leigh*, 727 F.2d at 130.

56. Informal delegation of investment authority to Harold Simmons by Alex Galbraith and John Sommer in June 1982 did not violate the KMPT trust document.

However, the Corporate Committee failed to comply with the trust document after the October 28, 1982 amendment. The necessary steps to formally delegate investment authority to Harold Simmons under the amended trust document were never taken. Thus, the delegation by the Corporate Committee to Harold Simmons violated ERISA § 404(a)(1)(D).

57. The failure of each of the other Defendants to take any steps to protest, inhibit, or prevent use by Harold Simmons of the KMPT assets pursuant to the illegal delegation constitutes a violation by those Defendants of ERISA § 404(a)(1)(D). And, each Defendant, other than Glenn Simmons, is liable under ERISA § 405(a)(2) for Harold Simmons' breaches.

58. With regard to the National-Standard transactions, Defendants Harold Simmons, Glenn Simmons and Michael Snetzer failed to discharge their duties solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and beneficiaries, in violation of ERISA § 404(a)(1)(A).

With reference to those claims upon which the Court has made a determination of liability, a trial will be held to consider the issue of damages. The Court will set a status conference on this case in the near future.